## STATE of Maine

### v.

### Gary Lee MITCHELL.

Supreme Judicial Court of Maine.

Aug. 9, 1978.

Charles K. Leadbetter (orally), Arthur A. Stilphen, Asst. Attys. Gen., Augusta, for plaintiff.

Daniel G. Lilley, Portland (orally), for defendant.

Before McKUSICK, C. J., and WERNICK, POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

POMEROY, Justice.

Appellant Gary Lee Mitchell was convicted by a jury of second degree Criminal Homicide, 17–A M.R.S.A. § 202. From judgment entered on the verdict he now seasonably appeals.

Several issues have been raised for our consideration. The first concerns the propriety of the trial justice's denial of a motion to suppress certain evidence.

The second relates to the admissibility of a wallet belonging to the victim. Appellant contends that its admission was so prejudicial as to outweigh any probative value.

Appellant also claims error was committed when the justice below admitted the testimony of the medical examiner who based his opinion on a "high probability" rather than on the standard of "reasonable medical certainty." Appellant contends next that it was error to exclude evidence of the victim's violent nature.

Finally, an attack is made on the sufficiency of the evidence.

We deny the appeal.

The jury would have been justified in believing the following facts. On the morning of November 15, 1976 a tenant of an apartment building in Portland observed a body lying in the alleyway behind the apartment. The police were notified and they arrived to investigate. During the course of the investigation the police found that a vacant third floor apartment showed signs of blood and a struggle. Blood near the window suggested that the victim had been thrown out the window.

In an attempt to locate people having some connection to the apartment, the police were eventually led to appellant, among numerous others. All individuals so located, including appellant, were asked to go to the Portland Police Department for routine questioning and for the purpose of making statements. Appellant, who had been located around 9:00 p. m., made a statement in which he detailed his activities on November 14 and 15, but denied knowing anything about the alleged homicide. There is no indication that the police did not believe the statement at that time. In any event, appellant remained at the station to await the completion of the transcription of his statement so that he could then read and sign it. Because of a delay in transcribing the statement due to a large backlog of work, appellant remained at the police station for some hours.

During the course of making his statement, appellant had mentioned that a friend, Ms. Irvine, with whom he was then living had also had some connection with the apartment. Police officers were then sent to interview Ms. Irvine. It became impossible to complete the interview at that time, however, because Ms. Irvine's child was awake and creating disturbances. The officers decided, with Ms. Irvine's acquiescence, to return sometime later in the evening.

After this abortive interview, while appellant was still waiting at the police sta-

tion, police officers accompanied the victim's wife and son back to the victim's apartment which had not been entered since the events leading to the alleged homicide. Immediately upon entering the apartment the victim's wife noticed that a robbery had occurred. She thereupon listed and described some of the items that had been taken.

At some point after the discovery of the robbery, the police decided to reinterview Ms. Irvine. Upon being freely readmitted to the apartment shared by appellant and Ms. Irvine, the police observed items which corresponded to the items taken from the victim's apartment. After questioning, Ms. Irvine told the police that appellant had brought the items into the apartment in the early morning hours of November 15. The officers decided not to seize the items at that time, but with Ms. Irvine's consent, one officer was left in the apartment.

When the officers returned to the police station they found appellant still waiting there and they informed him that they wished to question him further. Appellant was then read his *Miranda* rights. After being confronted with the fact that the police had found the allegedly stolen items in his apartment, appellant eventually admitted killing the victim and throwing him out the window. Appellant was arrested and asked to sign a consent form allowing the police to remove the items he had taken from the victim's apartment. After the consent form was signed, the police picked up the items in appellant's apartment.

During the trial the State produced evidence, some of which will be discussed later, tending to show that robbery was the motive for the killing. Appellant testified in his own behalf claiming self-defense.

## I. Motion to Suppress

At trial, appellant moved to suppress the statements he had made to the police as well as all the items the police had seized in his apartment. In essence, appellant contends that he should have been read *Miranda* warnings before he gave his first statement to the police. Without the *Miranda*

warning the information gained from the statement, that Ms. Irvine had some connection to the apartment where the alleged homicide took place, and all the following actions taken by the police, including appellant's ultimate confession, were fruit of the poisonous tree, *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and thus inadmissible against him.

Appellant also argues that the second entry into his apartment, when the police officers saw the allegedly stolen items, was improper since it was a warrantless search without any of the attending circumstances which might otherwise validate such a search. Accordingly, the seizure of the items and the resulting confession should have been suppressed, again as fruit of the poisonous tree.

Finally, appellant claims that the consent form that he signed was not a knowing or intelligent waiver of his Fourth Amendment rights. Appellant bases this claim on his allegation that both the length of his detention at the police station after he had made his statement and his use of depressants at the time resulted in his incompetency to make such a waiver. Thus, once again he claims that the items seized and the ultimate confession were inadmissible.

We disagree with all contentions.

We turn to a chronological analysis of all police behavior of which complaint is made.

At the hearing held on appellant's motion to suppress, the presiding justice found that appellant's first statements made at the stationhouse were legally admissible since *Miranda* warnings were not required under the circumstances. The statements were also found to be voluntary beyond a reasonable doubt.

■ The determination of the trial justice regarding the admissibility of a confession will not be set aside

. . . if, in accordance with the correct legal principle specifying the ultimate burden and requisite cogency of proof, the evidence provides rational support for the conclusions he reached. . .

*State v. Collins,* Me., 297 A.2d 620, 625 (1972).

The evidence before us clearly supports a determination that appellant was not in custody and had not been deprived of his freedom in any significant way. Appellant had freely accompanied the police to the station and he voluntarily agreed to wait there until his statement could be typed. No custodial interrogation had taken place and no *Miranda* warnings were required. *See State v. Lewis,* Me., 373 A.2d 603 (1977); *State v. Inman,* Me., 350 A.2d 582 (1976). Similarly, the record supports the justice's finding that the statement was voluntary beyond a reasonable doubt. While appellant did testify that he had taken depressants before he was interviewed initially, there was other credible evidence that appellant was "alert", "sober", and "perfectly normal." No constitutional blemish appears in regard to appellant's first statement.

■ The presiding justice further found that the police officers' second entry into the apartment shared by appellant and Ms. Irvine was legally proper. Accordingly, the justice found that the ultimate confession was not impermissibly "tainted."

Again these findings find ample support in the record.

■ It is clear that the police officers entered the apartment with the valid consent of Ms. Irvine. A search conducted pursuant to consent is a well recognized exception to the requirement that searches be conducted only after issuance of a warrant by a disinterested magistrate upon a showing of probable cause. *E. g., State v. McLain,* Me., 367 A.2d 213, 216 (1976). In order for the consent to be valid, however, there must be some "objective manifestation of consent" given, either by words or gestures. Moreover, the person giving consent "must bear an appropriate relationship

to the property to be searched." *Id.* at 216–17.

All these requirements are satisfied here. Ms. Irvine voluntarily admitted the police into an apartment where she lived and contributed to the rent.[1]

■ It is also clear from the record that once the officers entered the apartment, the stolen items were in plain view and were not obtained by any search. Under these circumstances there was no violation of appellant's Fourth Amendment right to be free of unlawful searches and seizures. *See State v. McLain, supra* at 218; *State v. Fitzherbert,* Me., 361 A.2d 916, 920 (1976); *State v. Little,* Me., 343 A.2d 180, 183 (1975). Accordingly, no unlawful taint attached to appellant's confession after he had been confronted with the fact that the police had discovered the items in his apartment.

We turn next to appellant's contention that the consent form which he signed was not a knowing or intelligent waiver of his Fourth Amendment rights.

Prior to the presiding justice's ruling on the motion to suppress, appellant's attorney stated that he considered the consent form to be invalid. The justice, however, made no express finding on the validity of the consent form, finding instead that the items had been lawfully seized under the "plain view" exception to the warrant requirement. No objection was ever made to the failure to rule on the consent form. With no ruling having been made on the issue below, we find that this issue is not properly before us,[2] unless an obvious error affecting substantial rights appears. *See* M.R. Crim.P. 52; M.R.Evid. 103(d).

*We find no such error.*

■ Even without the consent form, no unconstitutional seizure of the items in appellant's apartment occurred. As noted

---

1. There was testimony in fact that the apartment was rented in her name and that she paid the rent.

2. Numerous issues were raised at trial concerning whether appellant's statements and the items seized from his apartment should have

been suppressed. In such a situation, counsel should be alert to the possibility that the trial justice might inadvertently fail to rule on one issue. Clearly the duty rests on counsel to notify the justice of such omission.

above, the officers had entered appellant's apartment pursuant to the valid consent given by Ms. Irvine. Once inside the apartment, certain items from the victim's apartment were observed in plain view. The eventual seizure of the items plainly did not violate appellant's Fourth Amendment rights. Moreover, while not all the items seized were in plain view, no violation is apparent in relation to the seizure of these other items. Ms. Irvine accompanied the police officers through her apartment, pointing out the items that appellant had brought in on the morning of November 15 and consenting to their removal. To the extent that this procedure constituted a search, it was conducted with the consent of one legally entitled to so consent. Such consent is an exception to the necessity for a search warrant. *See State v. Koucoules*, Me., 343 A.2d 860 (1974); *State v. Thibodeau*, Me., 317 A.2d 172 (1974). Accordingly, the seizure of the items was constitutionally permissible.

## II. Admissibility of the Wallet

■ During the trial, the State introduced a wallet into evidence. The wallet was shown to have belonged to the victim and had been recovered from the South Portland dump. It was further shown that appellant had actually been to that particular dump on two occasions just prior to the murder. Appellant objected to the admission of the wallet on the grounds that its prejudicial effect outweighed any probative value it might have. The presiding justice found specifically that the evidence was relevant and that the probative value outweighed any prejudicial effect.

■ A trial justice has a wide scope of discretion in his rulings on the relevancy of evidence. *State v. Kelley*, Me., 357 A.2d 890, 895 (1976); *State v. Westphal*, Me., 349 A.2d 168, 171 (1975); R. Field and P. Murray, *Maine Evidence* § 401.1 (1976). There

is also a broad discretion inherent in a trial justice's determination under M.R.Evid. 403 whether the danger of unfair prejudice outweighs the probative value of otherwise relevant evidence. *See State v. Berube*, Me., 297 A.2d 884, 888 (1972).

Appellant has failed to show an abuse of discretion in either determination here.

The evidence was relevant in that it had some tendency to show a connection between appellant and the victim. Moreover, it could have shown that robbery was a factor that motivated appellant to take the victim's life. Appellant has also failed to show that he was unduly prejudiced by the admission.[3] His contentions on this point must fail.

## III. Testimony of the Medical Examiner

During the trial a considerable amount of testimony was produced on the question whether the victim had been dead or alive when his body was thrown out the window. Henry Ryan, M.D., the Chief Medical Examiner for the State of Maine, testified for the prosecution that in his estimation there was a "high probability" that the victim was alive when thrown out the window. When asked to define "high probability" the Doctor stated that he meant "the chances are probably in excess of 90 to 99 percent that he was alive when he went out the window." The witness felt, however, that he could not state that this was a "reasonable medical certainty." Over objection of defense counsel, the doctor's opinion as to the probability of the victim being alive was allowed to stand.

Appellant now contends that the admission of this testimony was prejudicial error since the Doctor refused to testify in terms of a "reasonable medical certainty."

The admissibility of opinion testimony by experts is governed by Rule 702 of the Maine Rules of Evidence, which provides:

---

**3.** Appellant appears to misconstrue the meaning of "unfair prejudice" in M.R.Evid. 403. Prejudice under the rule is something *more* than merely damage to appellant's case. " 'What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.' " *State v. Hurd*, Me., 360 A.2d 525, 527, n. 5 (1976) *quoting* C. McCormick, *Handbook on the Law of Evidence* 439, n. 31 (2nd ed. 1972); R. Field and P. Murray, *Maine Evidence* § 403.1 (1976).

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Appellant does not here challenge the qualifications of Doctor Ryan as a medical expert. The question is whether Doctor Ryan's opinion testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."

 The admissibility of expert testimony is a preliminary question to be determined by the presiding justice. M.R.Evid. 104(a); *State v. Hurd*, Me., 288 A.2d 478, 483 (1972). His decision may be reversed only upon a showing of abuse of that discretion.

We find no such abuse of discretion in the trial court's admission of Doctor Ryan's testimony.

 Appellant's contention that an expert must testify with "certainty" has been explicitly rejected in a number of decisions:

Alternatively, defendants argue that the testimony was inadmissible because it was not "to" a reasonable scientific certainty. As we understand their rather opaque argument, defendants appear to be saying that an expert's opinion testimony must be expressed in terms of a reasonable scientific certainty in order to be admissible. There is no such requirement. *United States v. Longfellow*, 406 F.2d 415, 416 (4th Cir.), *cert. denied*, 394

U.S. 998, 89 S.Ct. 1594, 22 L.Ed.2d 776 (1969); 3 *Weinstein's Evidence* ¶ 702[02], at 702–13. . . . We adhere to the rule that an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility. *United States v. Wilson*, 441 F.2d 655, 656 (2d Cir. 1971). *United States v. Cyphers*, 553 F.2d 1064, 1072–73 (7th Cir. 1977) *cert. denied* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977).

*See also State v. Edgin*, 110 Ariz. 416, 418–19, 520 P.2d 288, 290–91 (1974); *State v. Tilley*, 292 N.C. 132, 144, 232 S.E.2d 433, 442 (1977); *State v. Austin*, 52 Ohio App.2d 59, 66, 368 N.E.2d 59, 64 (1976); *State v. Vargus*, 373 A.2d 150, 156–57 (R.I.1977); *State v. Wind*, 60 Wis.2d 267, 271–273, 208 N.W.2d 357, 361–62 (1973).

The fact that Doctor Ryan testified in terms of a "high probability", rather than in terms of a "reasonable medical certainty", did not render his expert opinion unhelpful to the jury.[4] The degree of his certainty in this case merely goes to the weight of his testimony, not its admissibility. The trial court's admission of such testimony constitutes no abuse of discretion.

## IV. Evidence of the Victim's Violent Nature

 Appellant next objects to the exclusion of testimony which he sought to introduce regarding the victim's violent nature. Appellant contends that such evidence was relevant to his claim of self-defense. Suffice it to say that this type of testimony is clearly inadmissible under M.R.Evid. 404.[5]

---

**4.** As the foregoing discussion makes clear, the question whether medical opinion must be based on a "high probability" or a "reasonable medical certainty" becomes irrelevant. At least one court, however, has held that there is no distinction between the terms, noting that, whichever standard is used, there must be . . . "a conviction of the mind or that degree of positiveness that the doctor has in his opinion, which is based upon his knowledge of medicine and the case facts, that his belief is correct to a reasonable medical probability." *Pucci v. Rausch*, 51 Wis.2d 513, 518, 187 N.W.2d 138, 141 (1971).

**5.** M.R.Evid. 404 provides:
(a) *Character evidence generally.* Evidence of a person's character or a trait of his

character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
(2) Character of witness. Evidence of the character of a witness, as provided in Rules 607, 608 and 609.
(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

V. Sufficiency of the Evidence

Appellant's final arguments stem from his claim that it was error for the trial justice to deny his motion for judgment of acquittal or, in the alternative, to deny his motion to reduce the charge against appellant to Fourth Degree Homicide. A careful reading of the record convinces us that the evidence was clearly sufficient to support the verdict in this case.

The entry must be:

Appeal denied.

Judgment affirmed.