STATE of Maine

v.

Thomas MORTON.

Supreme Judicial Court of Maine.

Jan. 29, 1979.

Michael D. Seitzinger (orally), Asst. Atty. Gen., Charles K. Leadbetter, John Atwood, Vernon Arey, Asst. Attys. Gen., Augusta, for plaintiff.

Sanborn, Moreshead, Schade & Dawson by Gordon H. Smith (orally), Augusta, for defendant.

Before McKUSICK, C. J., and WER-NICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

McKUSICK, Chief Justice.

Following a jury trial in Somerset County, to which venue was transferred by consent of the parties pursuant to Rule 21(b),

M.R.Crim.P., defendant Thomas Morton was convicted of two counts of felonious homicide, 17 M.R.S.A. § 2651 (repealed P.L. 1975, c. 499, § 15), for the murders of Florence and Joaquin Bettencourt.[1] On appeal, defendant raises numerous claims of error. We deny the appeal.

Around 8:30 p. m. on December 9, 1973, a power failure in Liberty, Maine, left both the home of Florence and Joaquin Bettencourt and Mr. Bettencourt's nearby used clothing store without electric light. Mr. Bettencourt closed his store around 8:45 p. m., a bit earlier than usual, and returned home.

Sometime between 8:30 and 9:00 p. m. one of the Bettencourts' neighbors heard gunshots. Four days later a Waldo County Deputy Sheriff discovered the bodies of the Bettencourts on the premises of their residence. Mr. Bettencourt had been shot in the chest with shotgun pellets and in the forehead by a .22 caliber bullet. Mrs. Bettencourt suffered gunshot wounds from two different weapons, one of which appeared to be some kind of an automatic pistol. The Bettencourt home had been ransacked and the telephone wires cut. No money was found on the persons of either of the Bettencourts. Spattered candle wax drippings were found throughout the house.

Five days after the discovery of the murders police seized a tan Oldsmobile driven by defendant. A search of the car revealed wax drippings similar to those found in the Bettencourt home. Within one week of the vehicle search, defendant left the State of Maine for Florida.

I. *Sufficiency of the Evidence*

Defendant contends that the evidence adduced by the State fails to support the jury's verdict. We disagree. The jury had before it testimony of Morton's extrajudicial admission of participation in the murders, and the rest of the evidence, though circumstantial, was convincing and substantial.

Of critical importance was the testimony of prosecution witness Harold Smith. He testified that in mid-November of 1973, about three weeks prior to the Bettencourt murders, defendant, along with three other accomplices including Smith himself, met to discuss and plan a robbery. One of the accomplices said he knew of an old man, Joaquin Bettencourt, who ran a used clothing store and usually carried large sums of money on his person. Noting that the store owner often carried a gun, the accomplice commented that it might prove necessary to kill him if he offered any resistance. No objection was voiced to the plan, and the four conspirators agreed to rob Bettencourt as he returned home from his store that evening. They drove to the Bettencourt residence and arrived at 9:00 p. m. It was agreed that Smith would cut the telephone wires running to the Bettencourt home. Before he could finish that task, however Smith was observed, and the conspirators abandoned the robbery attempt. Smith testified that while the conspirators fled from the scene in a tan Oldsmobile driven by defendant, Morton commented that it would be "at least a month before the heat died down."[2]

The jury was apprised of numerous similarities between the November attempted robbery testified to by Smith and the December murders. First, both incidents occurred on a weekend, in the vicinity of 9:00 p. m., the store's customary closing time. Significantly, prosecution witness Regina Jackson testified that on December 9, 1973, the night of the murders, she overheard one of Morton's companions say to him: "We've got to get going because we've got to be there by nine." Second, similar weapons were used on both occasions. Smith testi-

1. We have had occasion to review the convictions of accomplices of Morton for these same murders. *See State v. Heald*, Me., 395 A.2d 457 (1978); *State v. Heald*, Me., 393 A.2d 537 (1978); *State v. Littlefield*, Me., 374 A.2d 590 (1977). *See also* n.2 below.

2. For his participation in this criminal venture, Morton was convicted of conspiracy to commit robbery. On appeal, we affirmed his conviction. *State v. Heald [and Morton]*, Me., 367 A.2d 1372 (1977).

fied that Morton carried a twelve gauge shotgun during the attempted robbery of mid-November and that one of his accomplices was armed with a .22 caliber revolver and another with an automatic pistol. Ammunition recovered by a pathologist who conducted the autopsies of the Bettencourts included shotgun pellets, a .22 caliber bullet, and ammunition that could have been fired by an automatic pistol. Third, an attempt was made to cut the phone wires during the November incident; the wires were found cut when the December murders were discovered.

Given the obvious similarity between the *modus operandi* of the two crimes and defendant's November statement that it would be "at least a month before the heat died down," the jurors were entitled to infer that Morton, having participated in one unsuccessful robbery attempt, returned to the Bettencourt home for a second attempt during which the murders occurred.

The presence in defendant's car [3] of wax drippings chemically consistent with the drippings found in the Bettencourt home after the murders added circumstantial evidence of defendant's guilt. Finally, and most importantly, Morton's erstwhile girlfriend, Judith Harvey, testified that Morton told her he had been involved in the Bettencourt murders and said that he had "plugged" Mrs. Bettencourt "full of holes" because he was afraid that if he allowed her to live she might have been able to identify him.

The trial testimony of co-conspirator Smith and girlfriend Harvey, the incriminating wax drippings, and defendant's departure from the State of Maine shortly after his car was seized and searched afforded the jury ample grounds for finding defendant guilty of the Bettencourt murders beyond any reasonable doubt.

## II. *Search of the Tan Oldsmobile*

Defendant does not dispute the fact that at about 4:00 p. m. on December 18, 1973,

the Maine State Police received information giving them probable cause to believe that a tan Oldsmobile, registered to one Marlene Roderick of Waterville, Maine, had been used in the commission of the Bettencourt murders. Waterville police placed the vehicle, then located in the Roderick driveway, under police surveillance. Simultaneously, the State Police commenced preparation of an affidavit for a search warrant. Before a warrant could be issued and executed, however, Waterville police noted that the car was being moved.

The vehicle was stopped by Waterville police officers on a public highway around 10:00 p. m. The driver turned out to be the defendant, Thomas Morton. The vehicle was then towed by Arbo's Wrecker Service to Arbo's Garage on Grove Street in Waterville. Officers from the Maine State Police laboratory traveling from Augusta arrived in Waterville at Arbo's Garage sometime between 11:30 and 11:45 p. m. They conducted a search of the car and discovered traces of wax drippings, later determined to be similar to drippings found in the Bettencourt home.

Morton contends that the police conducted an unconstitutional warrantless search and that consequently all evidence stemming from the search of the vehicle ought to have been suppressed. After a pretrial hearing, the presiding justice denied defendant's motion to suppress, noting, *inter alia*, that the exigent circumstances doctrine of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), validated the warrantless search. We find the presiding justice's ruling correct.

 When there is probable cause to search an automobile stopped on a public highway, immediate warrantless searches are constitutionally permissible because of the movable nature of the vehicle. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). If the attendant cir-

---

**3.** The tan Oldsmobile that is here designated as "defendant's car" was registered in the name of Mrs. Marlene Roderick, but was used by defendant 90–99% of the time. When the police

asked Mrs. Roderick's permission to search the car, defendant in a "loud whisper" told her he did not want the police to search the car.

cumstances make an immediate search on the highway unsafe or impractical, the car may be moved to a more convenient location. If a search is promptly conducted after its arrival there, the probable cause factor extant on the public highway remains in force, and the warrantless search is constitutionally permissible. *Chambers v. Maroney, supra*, 399 U.S. at 52, 90 S.Ct. 1975; *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *State v. Cress*, Me., 344 A.2d 57, 63–64 (1975).

■ Here, the need to employ trained officers who knew how to preserve delicate evidentiary material, such as wax drippings and blood stains, made an immediate search on the public highway impractical. The short delay between the car's arrival at Arbo's Garage and the commencement of the search was attributable to the fact that those trained officers had to travel from Augusta to Waterville. The vehicle search commenced as soon as they arrived and was expeditiously carried out without unnecessary delay. We conclude there was no error in the denial of defendant's pretrial motion to suppress the evidence obtained in the search of the car.

### III. *Discovery Issues*

#### A. *Financial Assistance*

■ Pursuant to former Rule 16(a) of the Maine Rules of Criminal Procedure,[4] defendant filed a pretrial discovery request seeking, *inter alia*, all documents relating to moneys paid by the State to any of the prosecution witnesses as compensation for their expenses incurred while attending other criminal trials. At a pretrial discovery hearing, the prosecuting attorney

testified that the State had spent money during the course of the earlier trial of Morton's accomplice, Charles Heald, to reimburse witnesses for bus tickets, motel costs, and, in one instance, a car rental. The presiding justice observed that evidence regarding those payments would be of little use to defendant. They would not significantly impeach the credibility of the State's witnesses because these witnesses did not profit by testifying for the prosecution; they were merely reimbursed for the expenses they incurred in the course of appearing as State witnesses. Accordingly, the presiding justice denied Morton's discovery request. On appeal, Morton has been unable to demonstrate any prejudice stemming from this ruling.

■ Nothing in the record indicates that the information sought by defendant was not readily available in the public records of disbursements made to the witnesses in the prior prosecutions. Rule 16 discovery is not designed to be a labor-saving device for defense counsel. Where the prosecution has material information which the defendant cannot easily obtain elsewhere, Rule 16 discovery is designed to equalize their positions. Here, since the public records were apparently accessible to both sides, Rule 16 cannot be employed by defense counsel for the purpose of making the prosecuting attorney do his work for him. *See State v. Boyajian*, Me., 344 A.2d 410, 413 (1975). Furthermore, defendant was in no way prevented from discussing the subject of financial reimbursement with prosecution witnesses in advance of trial, or from cross-examining them on this subject at the trial itself. On this record, we find

---

4. At the time of defendant's trial, Rule 16(a), M.R.Crim.P., provided:

"*Discovery and Inspection.* Upon timely motion of a defendant and upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph designated books, papers, documents, or tangible objects which are within the possession, custody, or control of the state, including written or recorded statements or confessions made by the defendant or a co-defendant, written or recorded statements of witnesses, transcripts of the testimony of witnesses before the grand jury, and the results or reports of physical examinations and scientific tests, experiments, and comparisons. The order shall specify the time, place, and manner of making the inspection and of taking the copies or photographs and may prescribe such terms and conditions as are just."

This rule was deleted and replaced on January 3, 1978, by a new Rule 16.

no abuse of discretion on the part of the presiding justice.

### B. Psychiatric Records

Defendant also made a pretrial discovery request for all psychological and psychiatric records pertaining to prosecution witness Judith Harvey in the possession of the Women's Correctional Center or the Bangor Mental Health Institute.

 Former Rule 16(a) could be used only to obtain materials "within the possession, custody, or control of the state." See note 4 above. Though the Women's Correctional Center and the Bangor Mental Health Institute are state agencies, former Rule 16(a) was not intended to require the prosecuting attorney to produce materials "not within his possession or the possession of his office, but filed elsewhere in some unrelated department of state government." *State v. Heald*, Me., 393 A.2d 537, 541 (1978). The word "state" in former Rule 16(a) imports nothing more than the office of the prosecuting attorney.[5] Since the requested psychiatric records were not in the possession of the prosecuting attorney, the presiding justice correctly denied defendant's pretrial discovery request for these materials.

### IV. Expert Opinion Testimony

 The prosecution presented the expert testimony of F.B.I. agent Ralph Strickland, who testified concerning the chemical composition of the wax drippings found in defendant's tan Oldsmobile and in the Bettencourt home. Strickland told the jury that infrared spectrophotometric analysis showed that both sets of drippings

were composed of paraffin and stearic acid.[6] Although he declined to state "positively" that the drippings in the Oldsmobile came from the same candle which produced the drippings found in the Bettencourt home, Strickland stated that the two sets of drippings were consistent in chemical nature and might have been produced by the same candle.

Also testifying for the State, Dr. Irving Goodof, a pathologist who examined the bodies of the Bettencourts, gave his opinion that they died sometime between December 9 and December 11, 1973. Aside from this estimate, Dr. Goodoff declined to pinpoint the time of death with any degree of "reasonable medical certainty."

 On appeal, Morton contends that the trial court erred in admitting the testimony of Strickland and Goodof over his objection because neither witness was willing to testify with "certainty" as to his opinion on relevant facts. We have recently rejected the contention that an expert must testify with "certainty," preferring instead the rule that "the degree of [an expert's] certainty . . . merely goes to the weight of his testimony, not [to] its admissibility." *State v. Mitchell*, Me., 390 A.2d 495, 501 (1978). Accordingly, Morton takes nothing by his contention that the trial court erred in admitting the testimony of these two expert witnesses.

### V. Refusal to Grant Mistrial

Defendant argues that prosecutorial misconduct in the course of cross-examination of defense witness Evelyn Francis required the declaration of a mistrial, which the trial justice declined to grant. We do not agree.

---

5. Subsection (b) of new Rule 16, M.R.Crim.P., effective January 3, 1978, clarifies the scope of the prosecuting attorney's duties, by providing in part:

 "The attorney for the State's obligation extends to matters within the possession or control of any member of his staff and of any official or employee of this State or any political subdivision thereof who regularly reports or with reference to the particular case has reported to his office."

6. Although defendant did not raise the issue at trial, he now argues for the first time on appeal that the subject of Strickland's testimony was

not a proper one for expert testimony. In making this determination, the trial judge must "consider whether the matter is beyond common knowledge so that the untrained layman will not be able to determine it intelligently and whether a person with specialized knowledge can give a helpful opinion." Field & Murray, *Maine Evidence* § 702.1 (1976). We have no doubt that the topic of infrared spectrophotometric analysis is an arcane subject beyond the ken of the average lay juror and that Strickland's expert testimony on this matter was therefore entirely appropriate.

Francis, the sister of Morton's accomplice Charles Heald, was asked by the prosecuting attorney if her brother was currently incarcerated in the Maine State Prison. Defense counsel did not object to this inquiry, and Francis answered in the affirmative. The prosecutor then started to inquire into the reason for Heald's incarceration, but before he could finish his question, defense counsel objected and the objection was sustained.[7] Arguing that the prosecutor had alerted the jury to the fact that Heald had already been convicted of participating in the murder of the Bettencourts, defense counsel moved for a mistrial. The prosecutor responded that he had merely intended to ask Francis about her brother's convictions for other offenses, unrelated to the Bettencourt murders, in an effort to show that Francis had testified for her brother on a number of past occasions.

There is no evidence that the prosecutor intended to refer to Heald's conviction for his part in the Bettencourt murders. Because the prosecutor was interrupted before he could finish his question,[8] the jury heard nothing more than the fact that Heald had been convicted of some crime—a fact they already knew from the preceding question and answer establishing Heald's current residence in the Maine State Prison. The trial justice noted that there had been no remark connecting Heald's incarceration to the Bettencourt murders. The motion for mistrial was correctly denied.

## VI. *Exclusion of Evidence of Alleged Threat Against Bettencourts by One Kelley*

Defense counsel called one Gary Kelley and asked him if he recalled having a conversation with Jeffrey Pyska in early December of 1973 at the Holiday Inn in Augusta. Kelley said he did not remember speaking to Pyska and specifically denied ever telling Pyska or anybody else that he had some intentions regarding the Bettencourts. Defense counsel then called Pyska as a witness. The prosecution objected, on grounds of relevance, to the anticipated testimony of Pyska, and the objection was sustained.

Defense counsel then made an offer of proof, stating that Pyska would testify that in early December of 1973 (about a week before the Bettencourt murders) at the Holiday Inn in Augusta Kelley, while displaying a revolver, told Pyska "that he wanted to rob the Bettencourts, or have someone else rob them, and he would pay $2,000." The presiding justice thereupon informed counsel that he would exclude the proffered testimony as irrelevant but would give further consideration to his ruling if the defense could adduce additional evidence linking Kelley to the Bettencourt murders. Defense counsel, however excused Pyska without asking him any questions and at no time presented any further evidence or offer of proof even mentioning Kelley or showing any involvement by him in the murders for which Morton was being tried.

The presiding justice committed no error in his handling of Pyska's proposed testimony. The determination of close questions of relevancy arising in the heat of trial is left to the discretion of the trial justice, and on appeal his ruling will be overturned only for an abuse of that discretion. *State v. Gagnon*, Me., 383 A.2d 25, 31

7. Defense counsel's motion for mistrial was based on the following line of questioning:

 "Q. Mrs. Francis, would you mind telling us your maiden name?
 "A. My maiden name?
 "Q. Yes.
 "A. Is Evelyn Heald.
 "Q. And your brother is Charles Heald, is he not?
 "A. Yes, Charles Heald is my brother.
 "Q. And Charles Heald is presently in the Maine State Prison, is he not?

 "A. Yes, he is.
 "Q. Because he was convicted _ _ _
 "[Defense Counsel]: Your Honor, objection.
 "[The Court]: I'll sustain the objection.

8. We do not mean to criticize defense counsel for interrupting. On the contrary, an alert defense attorney is to be commended for objecting quickly before prejudicial remarks have made their way into the record.

(1978); *State v. Lewisohn*, Me., 379 A.2d 1192, 1202 (1977). In view of the remoteness of Kelley's alleged remarks from the issue of Morton's participation in murdering the Bettencourts, we would be reluctant to find an abuse of discretion in the circumstances of this case.

In any event, however, we interpret the presiding justice's action to be an application of Rule 403, M.R.Evid.[9] In balancing the minimal probative value of the proffered testimony against the danger of confusion of the issues and misleading the jury, as well as considerations of undue delay and waste of time, the presiding justice was justified, and indeed in our considered judgment required, to rule as he did. Even if the proffered testimony was technically "relevant evidence" within the definition of Rule 401, M.R.Evid., ("evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"), it did little to prove or disprove anything involved in Morton's trial. Kelley's statement indicating, when taken at full face value, his interest in robbing the Bettencourts or having them robbed, is far removed from contradicting the evidence of Morton's participation in murdering the Bettencourts. At most, the thrust of the proffered testimony is that Kelley might also have been involved in some way in the Bettencourt robbery, in the course of which the victims were killed. The physical evidence points without contradiction to the fact that several persons participated in the murders.

Remote evidence that another individual— Kelley—might also have been within that guilty group, directly or as a procurer, does nothing to disprove the involvement of defendant Morton. That evidence in no way disproves any of the numerous individual pieces of evidence tying Morton to the crime, such as Morton's admission to Judith Harvey, the presence of candle wax in his car, his participation in the prior aborted robbery attempt, and his attempt to prevent the search of his car. Pyska's testimony had little or no probative value in the trial of Morton for participating in the group responsible for the Bettencourt murders.

On the other side of the Rule 403 balance, injection of the question whether Kelley was also involved would tend to turn the Morton trial into a trial of Kelley. It would confuse the single issue in the Morton trial: Was Morton one of the several murderers of the Bettencourts? The jury could be misled into thinking that any evidence of Kelley's possible involvement admitted in Morton's trial necessarily raised a doubt as to Morton's participation. If Pyska's testimony were admitted, the State could hardly be denied the opportunity of presenting in turn evidence that Kelley was not involved, and the Morton trial would then go far afield from the issue of Morton's guilt or innocence, causing undue delay and waste of time. Pyska's testimony was properly excluded in absence of any further details increasing its probative value so as to offset the negative consequences of its admission.

**9.** Rule 403, M.R.Evid., reads in full as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
Questions of the admissibility of threats uttered by a person other than the defendant against the victim of the crime were at one time resolved by application of the judicially created "direct connection" test. That test required that the defendant show that the threat was uttered by someone who "committed some act directly connecting him with the crime" and

"tend[ing] clearly to point out someone besides the accused as the guilty person." *State v. Umfrees*, 433 S.W.2d 284, 287–88 (Mo.1968). *See Alexander v. United States*, 138 U.S. 353, 11 S.Ct. 350, 34 L.Ed. 954 (1891); *People v. Mendez*, 193 Cal. 39, 223 P. 65 (1924). Although Dean Wigmore recognized that the "direct connection" test enjoyed widespread acceptance, he criticized it sharply. 1 J. Wigmore, *Evidence* § 139 (3d ed. 1940). We have no reason for taking sides in that controversy, preferring instead to analyze the admissibility of the evidence of Kelley's threats in terms of the general balancing principle of Rule 403, M.R.Evid.

Whether the presiding justice's exclusion of the Pyska story represented a determination of lack of relevance or a balancing of considerations under Rule 403, he committed no error of which this appellate court will take cognizance.

## VII. Exclusion of Evidence Regarding Blood Stains Found in Defendant's Car

At trial, Marlene Roderick, the registered owner of the tan Oldsmobile driven by defendant, testified that two days before the search of the car Morton had returned the car to her with the assurance that he had vacuumed the car thoroughly and had "made sure it was very clean." Anticipating correctly that the prosecution would argue to the jury that Morton had cleaned the car in an attempt to destroy all evidence which might link him to the Bettencourt murders,[10] defendant tried unsuccessfully to introduce evidence showing that an F.B.I. laboratory analysis of blood-stained items found in the car revealed the presence of deer blood. Drawing upon the fact that Marlene Roderick testified, both on direct and on cross-examination, that her husband had been engaged in illegal night hunting, defense counsel argued that the F.B.I. blood analysis would forcefully support the contention that Morton cleaned out the car in an attempt to destroy evidence which might incriminate his friend, Mr. Roderick. The trial justice refused, however, to allow defense counsel to question State Police Officer Ronald Eccles on the subject of the F.B.I. blood analysis. The justice concluded that "the fact that someone used this car and may have engaged in other crimes is not particularly relevant to this matter."

Later in the course of the trial, defense counsel again raised the issue of the admissibility of the F.B.I. blood analysis, stating the rationale for the relevancy of the evidence with greater clarity than before.[11] Defendant made a complete offer of proof. The prosecuting attorney, while reasserting his objection to the evidence on relevancy grounds, stated he was willing to stipulate that if the evidence was allowed it would show the presence of both ruminant animal blood and other unidentifiable blood in defendant's car. Defense counsel contended it would show more specifically that the ruminant blood was actually deer blood. The prosecuting attorney then agreed to stipulate that the evidence, if admitted, would show the presence of both deer blood and blood of an unknown origin. The defense was denied the opportunity to get this stipulated evidence before the jury.

■ On this record we are compelled to find that the presiding justice's exclusion of defendant's offered evidence was erroneous. The prosecutor initially presented evidence showing that defendant thoroughly cleaned out the car before returning it to Mrs. Roderick. This testimony was clearly relevant. It supported the inference that defendant had attempted to conceal evidence linking him to the Bettencourt murders. Defendant merely sought to rebut this inference. If the prosecution's explanation of defendant's conduct was relevant as tending to support the inference of defendant's guilt, then the defense's alternative explanation of the same conduct in an effort to demonstrate defendant's innocence must be equally relevant. See State v. Clark, Me., 394 A.2d 779, 782 (1978). The trial court erred in denying defendant the opportunity of showing that some of the blood stains in his car were of deer blood.

---

10. In his closing argument, the prosecuting attorney commented:

"Now when he [defendant] brought it [the car] back, he told Marlene that he had cleaned it out thoroughly, but he had not cleaned it thoroughly enough to pick up the red, red-pink, coral, whatever color you choose to attach to it, wax that was attached to the handles of the car."

11. Defense counsel stated:

"You [the prosecution] have elicited testimony that he [defendant] cleaned the car. We are making the point that that has created a suspicion that he cleaned it out because it was used for some illicit purposes. For your purposes, you know, it's one thing, for our purposes it's consistent that he had cleaned out the car because it had been used for night hunting."

That error, however, does not justify reversal of the jury's finding beyond a reasonable doubt that Morton participated in murdering the Bettencourts. First, defense counsel was not prevented from arguing to the jury his explanation of defendant's car-cleaning conduct.[12] Furthermore, if the blood analysis results had been admitted, the jury would have been apprised that Morton's car contained not only deer blood but also other blood of an unknown origin, which the jury might have inferred to be the blood of one or both of the murder victims. Thus, admission of the blood analysis would have both helped and hurt defendant's case.

Even if the blood analysis had been admitted in evidence, the rest of the evidence amply supported the jury's finding of defendant's guilt beyond a reasonable doubt. At most, the asserted exculpatory explanation for Morton's thorough cleaning of the car before turning it over to Mrs. Roderick goes to only one, relatively minor thread in the solid fabric of the State's case. The fact that defendant's car may have been used for night hunting by Mr. Roderick would not in any way detract from the evidence that showed that defendant admitted his participation in the Bettencourt murders to Judith Harvey. The presence of candle wax in defendant's car similar in chemical composition to the wax found in the Bettencourt home raised a strong inference of guilt that the blood analysis would not have explained away. In addition, the jury heard Smith's testimony that defendant had participated in the aborted robbery attempt of November 1973, which bore many similarities to the operative facts of the December murders. Finally, defendant's November statement that it would be "at least a month before the heat died down," his attempts to prevent his car from being searched, and his departure from the State of Maine to Florida shortly after the car was seized, all point inescapably to the conclusion that Morton was involved in the crimes for which he was tried.

Given the strong evidence of guilt adduced by the State, we conclude that any error in excluding the blood analysis evidence did not constitute prejudicial error.

## VIII. *Defendant's Other Claims of Error*

Defendant has raised some ten other issues concerning the admission and exclusion of evidence, double jeopardy, and discovery requests. We have read with care the voluminous transcript of the trial, giving particular attention to every one of defendant's claims of error. We find merit in none of them.

Accordingly, the entry must be:

Appeal denied. Judgment affirmed.

POMEROY and NICHOLS, JJ., did not sit.

---

12. In his closing argument defense counsel said:

"Now when Thomas Morton suggested to Marlene Roderick that she ought not let them search the car, it is just as reasonable to suggest, isn't it, that he was concerned about any night hunting implications as anything else at that time—the 30–06 ammunition, the red substance throughout the car, and you have heard the officers' testimony about that. Yet the State gives great emphasis to that, and they say this guy was cleaning out his car in December 1973, therefore, this has great significance. I ask you whether it is also reasonable from the evidence that the State has presented, can you say beyond a reasonable doubt that that is not the alternative way of looking at it, that there was evidence of night hunting, and that Thomas Morton being friends of the family, the Roderick family, was suggesting to Marlene Roderick that she did not have to help the State convict her husband at that time of night hunting."