**STATE of Maine**

v.

**Earl WOODBURY.**

Supreme Judicial Court of Maine.

June 29, 1979.

John R. Atwood, Charles K. Leadbetter, Linda Sibery Crawford, (orally), Asst. Attys. Gen., Augusta, for plaintiff.

Skelton, Taintor & Abbott by Robert Checkoway, Lewiston, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Following a Superior Court jury trial in Knox County, defendant Earl Woodbury was convicted of murder, 17–A M.R.S.A. § 201 (Supp.1978).[1] On appeal defendant raises five claims of error. He contends that the trial justice erred in admitting an inaccurate sketch of the murder scene, a prejudicial photograph of the murder victim, and certain expert opinion testimony. In addition, defendant asserts that the trial justice erroneously instructed the jury on the definition of "depraved indifference" murder and that the evidence was insufficient to support the conviction. Since we find no merit in any of defendant's claims of error, we deny the appeal.

### 1. *Facts of the Case*

The jury would have been warranted in finding the following facts. Some four or five days prior to February 25, 1978, three inmates at Thomaston State Prison planned

---

1. Section 201(1) provides:

   "A person is guilty of murder if:

   "A. He intentionally or knowingly causes the death of another human being;

   "B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being; or

   "C. He intentionally or knowingly causes another human being to commit suicide by the use of force, duress or deception."

an attack on a fourth inmate, Basil Ward. Defendant Earl Woodbury promised inmates Larry Coon and James Cole that he would pay them, in money and marijuana, if they would help him assault Ward. The three agreed that Coon would punch Ward in the face, Cole would make sure that Ward was knocked out by Coon's blow, and defendant Woodbury would then break Ward's fingers.

On the morning of February 25, defendant met with Coon and Cole to carry out their plan during the breakfast period. They conspired to lure Ward into the prison novelty room where the attack would take place. Because Woodbury was unable to get the guards to allow Ward into the novelty room, they were forced to postpone the attack until the noon meal. Coon, Cole, and Woodbury smoked some marijuana in the novelty room and agreed to meet again at 11:45 a. m. to carry out the planned assault.

The three met again at the appointed hour. Coon and Cole went into the novelty room to wait for Woodbury to return with Ward. Ward entered the room first, followed by Woodbury. Coon suddenly stepped into Ward's path and punched Ward in the face, knocking him to his knees. Coon then grabbed Ward by the hair and hit him again in the mouth. Ward fell to the floor and Coon fled from the room. Ward pushed himself across the floor and raised himself into a sitting position with his back against a wall of metal lockers. Cole then kicked Ward in the face once and attempted to kick him a second time, but Ward grabbed Cole's legs and prevented Cole from delivering the second kick. Shaking free from Ward's grasp, Cole fled from the room.

Ward was still conscious when Cole left. While Ward attempted to raise himself up onto his hands and knees, defendant picked up a wooden two-by-four and struck Ward twice on the back of the head. Ward remained conscious after those two blows with the two-by-four. Woodbury then delivered a third blow, also to the back of the head, which broke the two-by-four into two pieces and knocked Ward unconscious. Woodbury then left the room.

■ Unbeknownst to Coon, Cole, and Woodbury, inmate David Stevens had witnessed the entire assault from the door of the novelty room toilet. On defendant's departure, Stevens examined Ward, noting that blood was streaming from his head wounds. Fearing that he would be blamed for the assault, Stevens left the novelty room. Ward was discovered shortly thereafter. He died within hours of the assault, of lacerations, skull fracture, and edema of the brain.[2]

### 2. *Admission of the Sketch*

Detective Barry Hathaway testified for the prosecution. He stated that he conducted a personal investigation of the prison novelty room shortly after Ward was discovered. Hathaway personally drew a diagram of the novelty room which was received in evidence at trial as State's Exhibit No. 1. The sketch portrayed the room as rectangular when in fact the room was nearly perfectly square. This distortion made it appear that Stevens, who stood at the bathroom door while observing the as-

---

**2.** Woodbury contends that the evidence was not sufficient to prove that his three blows with the two-by-four caused the death of Ward. Defendant asserts that the evidence fails to overcome the reasonable doubt that it may have been Cole's kick that killed Ward. We cannot agree.

First, Ward was conscious when Cole left the room and remained conscious after the first two blows struck by defendant with the two-by-four. Only after the third blow was delivered by Woodbury was Ward rendered unconscious. Second, State Medical Examiner Dr. Henry Ryan testified that after performing an autopsy he concluded that Ward died from

skull lacerations, skull fracture, and edema of the brain. His autopsy revealed that Ward suffered two serious head wounds. According to Dr. Ryan, both wounds could have been caused by the same instrument (namely, the two-by-four) if one wound was caused by a blow with the edge of the two-by-four at the point of contact and the other wound was caused by a blow or blows with the flat surface of the two-by-four at the point of contact. From such evidence, the jury could well conclude beyond a reasonable doubt that the three blows delivered by Woodbury, and not the kick delivered by Cole, caused the death of Ward.

sault, would have had an unobstructed view of the assault, when in fact a table located in the middle of the room partially obstructed his view of the incident.

██ A sketch or diagram is generally admissible to illustrate the testimony of a witness so long as the sketch represents an accurate portrayal of the facts which the witness is attempting to relate. *United States v. D'Antonio,* 324 F.2d 667, 668 (3rd Cir. 1963), *cert. denied,* 376 U.S. 909, 84 S.Ct. 662, 11 L.Ed.2d 607 (1964); *Grayson v. Williams,* 256 F.2d 61, 61 (10th Cir. 1958); McCormick, *Evidence* § 213 (1972). When a trial judge has exercised his discretion to admit a sketch, he will rarely be reversed for abuse of discretion if the record indicates that any potentially misleading inaccuracy has been pointed out by witnesses, or if the inaccuracy was, or could have been, adequately exposed on cross-examination. *See, e. g., Grandquest v. Williams,* 273 Ala. 140, 135 So.2d 391 (1961); *Arkansas State Highway Comm'n v. Rhodes,* 240 Ark. 565, 401 S.W.2d 558 (1966); *Mississippi Road Supply Co. v. Baker,* 199 So.2d 820 (Miss.1967).

██ In the case at bar, although Detective Hathaway conceded on direct examination that his sketch was not drawn to scale, he also testified that the dimensions of the room (24 × 26 feet) were accurately stated on the sketch. He admitted that the sketch incorrectly showed the room as rectangular rather than nearly square. On cross-examination, Hathaway again conceded that the sketch erroneously represented the shape of the room and that the distortion materially affected the portrayal of what inmate Stevens would have been able to see from his position in the bathroom door. Over defense counsel's objection the trial justice admitted the sketch, noting that the inaccuracy in the sketch had been fully developed for the jury in both the direct and cross-examination of Detective Hathaway. Under these circumstances we conclude that the admission of the sketch was not erroneous.

### 3. *Admission of Photograph*

██ Defendant contends that the trial justice erred in admitting State's Exhibit No. 7, a photograph of the head wounds inflicted upon the victim Basil Ward. The long-standing rule in Maine is that it is within the sound discretion of the trial court to exclude photographs on the basis of unfair prejudice that outweighs the probative value of the exhibit. *State v. Boucher,* Me., 376 A.2d 478, 480 (1977); *State v. Bazinet,* Me., 372 A.2d 1036, 1038 (1977); *State v. Berube,* Me., 297 A.2d 884, 888 (1972).

██ Under some other circumstances, the admission of the photograph objected to by defendant might well be error. The gruesome nature of the wounds suffered by the victim Basil Ward cannot be denied, nor can the potential for the prejudicial inflammation of the emotions of the jurors be ignored. Nevertheless, the probative value of the photograph is also undeniable. The victim was assaulted by three inmates. The State correctly anticipated defendant's argument that the kick delivered by inmate Cole, rather than the blows administered by defendant, may have been the proximate cause of the death of Basil Ward. To prove the element of causation, the State had to rely on the photograph to illustrate the testimony of Dr. Henry Ryan, the State Medical Examiner. Dr. Ryan explained that Cole's kick could not have produced the wounds depicted in the photograph and therefore that Cole's kick did not cause the death of Basil Ward. Given the highly probative value of the photograph on the issue of the cause of death, we reject defendant's contention that the trial justice abused his discretion in admitting the photograph.

### 4. *Expert Opinion Testimony*

Three expert witnesses were called to testify by the State. Dr. Ryan gave his opinion that one of Ward's head wounds was inflicted by a blunt-edged instrument and that a second head wound was produced by a flat instrument. The prosecuting attorney asked Dr. Ryan whether the two

wounds "could" have been inflicted by the same instrument, and Dr. Ryan replied that in his expert opinion "they very well could be." [3] He explained that in his opinion Ward died from lacerations of the scalp, fracture of the skull, and edema of the brain.

Fingerprint expert Paul Lessard testified that a fingerprint found on the wooden two-by-four recovered at the scene of the crime was, in his opinion, "identical" to an exemplar fingerprint taken from defendant. Lessard did not quantify his degree of confidence in his opinion, and defense counsel did not cross-examine him on this point.

Finally, state police serologist Marc Anton testified that Ward's blood was Type O and that in his opinion blood found on the recovered wooden two-by-four was also Type O. Again, defense counsel did not cross-examine Anton on the degree of certainty with which he voiced his opinion.

■ Defendant challenges the admission of these three expert opinions on the ground that none stated the degree of certainty with which he held his opinion. We have recently rejected the contention that an expert must testify with "certainty", preferring instead the rule that the degree of an expert's certainty affects the weight to be accorded to his testimony but does not affect the admissibility of his opinion. *State v. Mitchell*, Me., 390 A.2d 495, 501 (1978). Defendant concedes that our decision in *Mitchell* held it to be immaterial whether an opinion is phrased in terms of "high probability" or "reasonable medical certainty." *Id.* at 501. But defendant maintains that expert opinions may not be received where they are phrased without any stated degree of certainty, or where they are framed only in terms of a mere "possibility." We disagree.

■ As one court put it, in a case where the causation of an injury was in dispute, the issue of admissibility "does not turn on the use of a particular form of words by the physicians in giving their testimony . . . . [T]he failure of a medical witness to testify positively as to what was the cause of the injury, or his statement that the accident 'might' be or 'probably' was the cause of the injury, is merely a circumstance to be taken into consideration by the trier of facts." [4] *Dzurik v. Tamura*, 44 Haw. 327, 330, 359 P.2d 164, 165–66 (1960).

In a murder case decided over one hundred years ago, the Law Court approved the admission of a surgeon's expert opinion that the fatal wound suffered by the victim was inflicted by a razor. "[I]t was a proper inquiry . . . whether the razor . . . in his opinion *could* have produced the wound, and proper to be answered. The most obvious object was to ascertain if the wound examined corresponded in form with that which *could* be caused by that particular instrument." (Emphasis added) *State v. Knight*, 43 Me. 11, 130 (1857). Very recent-

---

**3.** The prosecuting attorney asked Dr. Ryan to elaborate on how one instrument could produce two wounds, "one with a clean, albeit an abraded edge, and the other producing somewhat larger abraded surfaces?" Dr. Ryan responded: "Well, if I took this tape recorder here, a small cassette tape recorder, and hit you on the head with it with a flat surface, you might very well get an injury, especially if I did it twice, similar to the lower [head wound depicted] in the picture [State's Exhibit No. 7]. And then all I would have to do is turn it ever so slightly, such that the edge of that machine is what I hit you with now, not the flat side, but I hit you right at the edge, almost directly into the edge, and I would produce a laceration with enough force that is exactly like this clean laceration up at the top."

**4.** There is no shortage of case law on the subject of the admissibility of expert opinions dealing with the causation of medical injuries. As Dean Wigmore pointed out, "[C]ourts sometimes misapply the opinion rule to enforce the doctrine of torts that a recovery for future personal injuries must include only the certain or fairly probable, but not the merely possible consequences; so that the judge, instead of covering the subject by an instruction to the jury as to the measure of recovery, excludes from evidence a physician's opinion expressed in terms of possibility only. This attempt to control the course of expert testimony is of course unreasonable in itself." 7 J. Wigmore, *Evidence* § 1976 (Rev.Ed. 1978). The distinction between the tort doctrine and the evidentiary principle is discussed in *Sarzynski v. Stern*, 13 Mich.App. 158, 163 N.W.2d 641 (1969).

ly, in *State v. Morton*, Me., 397 A.2d 171, 177 (1979), we upheld the admission of an expert opinion that two sets of candle wax drippings "might" have been produced by the same candle.

▮▮▮ The Utah Supreme Court has held that an expert's opinion "may be cast in the form of 'what did' cause, as well as 'what might' or 'what could' have caused a particular occurrence or condition, depending upon the degree of positiveness the witness desires to give his opinion . . ." *Hooper v. General Motors Corp.*, 123 Utah 515, 521, 260 P.2d 549, 552 (1953). We think this statement of the law is correct.[5] The trial justice in the case at bar did not err in admitting the three expert opinions rendered by Lessard, Anton, and Dr. Ryan. The degree of confidence with which each held his opinion was open for exploration on cross-examination and might affect the weight to be accorded their testimony by the jury. But there is no threshold level of certainty required of an expert before his opinion may be admitted in evidence.[6]

### 5. *Murder Instructions*

In a single-count indictment defendant was charged with two alternative forms of murder: (i) "intentional or knowing" killing under paragraph (A) of 17–A M.R.S.A.

§ 201(1), and (ii) "depraved indifference" killing under paragraph (B) of section 201(1).[7] Paragraph (B) provides that a person is guilty of murder if:

"He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being."

▮▮▮ The trial justice instructed the jury that a conviction for murder under paragraph (B) did not require the State to prove that Woodbury was subjectively indifferent to the value of human life; it merely required that the jury find Woodbury's conduct, objectively viewed by a reasonable man, manifested a depraved indifference towards human life. The court stated, "It is not necessary that the proof or the evidence show a depraved indifference in fact in the accused, it is sufficient that the conduct of the accused manifests or shows a state of mind which is generally considered by mankind to be depraved." Defendant contends that this instruction was erroneous and that the State should have been required to prove that Woodbury was personally indifferent to the value of human life. We disagree. The trial court's instruction was entirely correct.

▮▮▮ Prior to May 1, 1976, the effective date of the Criminal Code, Maine law[8]

5. Other cases upholding the admissibility of expert opinions on the cause of injuries are not hard to find. *See, e. g., State v. Johnson*, 66 S.C. 23, 44 S.E. 58 (1903) (whether wounds "could" have been caused in a certain way); *State v. Noakes*, 70 Vt. 247, 40 A. 249 (1898) (infant's skull could "possibly" have been fractured by hand pressure); *State v. Barton*, 5 Wash.2d 234, 105 P.2d 63 (1940) (physician's testimony that a particular wound "could" have been caused by a particular instrument); *State v. Mooradian*, 132 Wash. 37, 231 P. 24 (1924) (how physical injuries "were or might have been inflicted"); *State v. Evans*, 136 W.Va. 1, 5–6, 66 S.E.2d 545, 548 (1951) [medical testimony that action of defendant doctor "could" have produced injuries to unborn child held admissible: "Testimony by an expert witness is not objectionable for the reason that it relates to whether a given effect *might* result from a certain cause." (Emphasis in original)].

6. Of course, a trial justice always retains the discretion to exclude technically relevant and admissible evidence if considerations of undue

delay and waste of time outweigh the minimal probative value of the evidence offered. *See State v. Morton*, Me., 397 A.2d 171, 179 (1979), and Rule 403, M.R.Evid. If a party sought to prove a particular fact by offering an expert's opinion that that fact was "extremely unlikely and yet not entirely impossible," a trial justice might well conclude that the minimal probative value of such an opinion warranted its exclusion under Rule 403, M.R.Evid.

7. See n. 1 above for text of 17–A M.R.S.A. § 201(1).

8. The common law definition of murder previously appeared in 17 M.R.S.A. § 2651 (1964), which provided:

"Whoever unlawfully kills a human being *with malice aforethought, either express or implied*, is guilty of murder . . . ." (Emphasis added)

This definition was first declared by statute in Maine by the Resolves of 1840, ch. 109, which enacted the Revised Statutes of 1841. Upon

clearly provided that the element of "malice" that must be proved by the State for a murder conviction can be satisfied either by proof of a premeditated subjective intention to cause the death of another, or by proof of conduct "which *objectively evaluated* is characterized by a high death producing potential." (Emphasis added) *State v. Lafferty*, Me., 309 A.2d 647, 671 (1973) (Wernick, J., concurring). The latter form of malice, known as "implied" malice,[9] is present where " 'there is no showing of actual intent to kill, but death is caused by *acts which the law regards* [*i. e.*, whether or not the actor so regards them] as manifesting such an abandoned state of mind as to be equivalent to a purpose to murder.' " (Emphasis added) *State v. Park*, 159 Me. 328, 332, 193 A.2d 1, 3 (1963); *State v. Merry*, 136 Me. 243, 8 A.2d 143, 146 (1939).

When the Criminal Code went into effect on May 1, 1976, it created six degrees of "criminal homicide." In that original Criminal Code formulation, first degree criminal homicide was defined as the commission of

second degree homicide under any one of six aggravating circumstances specified in section 201(2). The definition of second degree criminal homicide, which replaced the common law definition of murder contained in 17 M.R.S.A. § 2651, required proof that the accused caused the death of another "*intending* to cause such death, or *knowing* that death will almost certainly result." (Emphasis added) P.L.1975, ch. 499, § 1, as amended in other respects by P.L. 1975, ch. 740 § 40. This new definition, coupled with the definition of the terms "intentionally" and "knowingly" in 17–A M.R.S.A. § 10(1) and (2), precluded convicting the accused of second degree homicide absent, at the very least, a *subjective* awareness on the part of the accused that his conduct created a risk that the death of another would "almost certainly result." This definition did not permit a conviction for second degree homicide to rest upon proof that an *objective* evaluation would lead a reasonable person to conclude that death would almost certainly result from the conduct of the accused.

---

the recommendation of former Chief Justice Prentiss Mellen, chairman of the commission appointed by the legislature to revise the statutes of Maine, R.S. 1841, ch. 154, § 1 adopted the definition of murder set forth in the case of *Commonwealth v. Bowen*, 13 Mass. 356 (1816). The commissioner stated that it was their intention "to render the law more clear and certain . . . by converting into *statute* law a multitude of *common* law principles which have become the settled and acknowledged law of the State." (Emphasis in original) *Report of the Commissioners Appointed to Revise the Public Laws of the State of Maine* (Augusta 1840).

**9.** Prior to the Criminal Code the use of the word "recklessly" in jury instructions defining "implied malice" in murder prosecutions created an ambiguity that this court noted on more than one occasion. We recognized that the "reckless disregard for the lives and safety of others," which constituted an element of manslaughter, was not to be equated with "reckless conduct," which constituted an element of murder.

" 'Reckless conduct' which, *when viewed objectively* is considered in law to have the equivalent effect of a subjective intention to kill, is traditionally described as 'reckless and wanton and willful' conduct. Although *it necessarily involves neither a subjective intention to kill nor a subjective awareness of the serious danger to which others are ex-*

*posed, (State v. Lafferty*, Me., 209 A.2d 647, 672 n. 5 (1973)) it is regarded in law as such a serious disregard of the obligation to exercise reasonable care so as not to unreasonably endanger the lives and safety of others as to be tantamount to a subjective intention to kill, and deserving of the same punishment." (Emphasis added) *State v. Ellis*, Me., 325 A.2d 772, 776 n. 2 (1974).

The difficulties engendered by the two different meanings given the single term "reckless" prompted the legislature, when it enacted the new Criminal Code, to include an express unitary definition of the word "recklessly." As defined in the Code, 17–A M.R.S.A. § 10(3) (Supp.1978), the term "recklessly" refers exclusively to a *subjective* awareness of a risk. In the original Criminal Code definitions of criminal homicide, the term "recklessly" as thus restricted in its meaning was used only to define criminal homicide in the fourth degree. 17–A M.R.S.A. § 204, as enacted by P.L.1975, ch. 499, § 1. In the reinstatement, as of October 24, 1977, of the murder-manslaughter classification, the reckless causing of the death of another human being, which under the original Code was criminal homicide in the fourth degree, was without substantive change relabeled as one type of "manslaughter." P.L.1977, ch. 510, § 40, enacting 17–A M.R.S.A. § 203 (Supp. 1978).

In P.L.1977, ch. 510, §§ 38–43, effective October 24, 1977, the legislature repealed the statutory framework setting forth six degrees of criminal homicide and returned to the murder-manslaughter classification employed before the Code. The crimes of first and second degree criminal homicide were replaced with one definition of the crime of murder, which included the provision contained in section 201(1)(B) that a person is guilty of murder if "[h]e engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being." By allowing a conviction for murder to rest upon proof that the "conduct" manifested a depraved indifference to the value of human life, section 201(1)(B) called for an application of an objective standard of evaluation, such as that which had been applied in decisions under former 17 M.R.S.A. § 2651.

Thus, in completely revamping the original Code definitions of criminal homicide, the legislature used language taken directly from pre-Code case law to define the second branch of murder and thereby reflected a legislative judgment that an objective standard of evaluation is to be applied. Section 201(1)(B) now provides that the factfinder is to determine whether the defendant's *conduct* manifested depraved indifference to the value of human life. This definition parallels the prior case law that focused on the death-producing *acts* to determine whether "the law regards" such "acts" as manifesting a depraved indifference to the value of human life. *State v. Park, supra; State v. Merry, supra.* The legislature thus gave expression to "the public policy judgment that homicides which are rendered criminal . . . by the high *objective* tendency of [the actor's] conduct to produce death" are to have "attributed to them the highest degree of blameworthiness for purposes of severity of punishment." *State v. Lafferty, supra* at 672.

In the case at bar the trial justice's instructions correctly read the 1977 amendment of the Criminal Code to reinstate the objective standard for evaluating death-causing conduct that is so heinous in the eyes of the law as to constitute murder.

The entry must be:

Appeal denied.

Judgment affirmed.

POMEROY and DELAHANTY, JJ., did not sit.