**STATE of Maine**

v.

**George F. GATCOMB, Jr.**

Supreme Judicial Court of Maine.

July 26, 1978.

David M. Cox, Dist. Atty., Gary F. Thorne (orally), Asst. Dist. Atty., Bangor, for plaintiff.

Paine & Lynch by Errol K. Paine, Bangor (orally), for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

ARCHIBALD, Justice.

 George F. Gatcomb, Jr., was indicted for violating 17 M.R.S.A. § 2656 (Assault with Intent to Kill).[1]

On May 6, 1976 (after the effective date of the Maine Criminal Code), Gatcomb is alleged in a three-count indictment to have violated 17–A M.R.S.A. § 401 (Burglary), 17–A M.R.S.A. § 353 (Theft), and 17–A M.R.S.A. § 209 (Criminal Threatening with a Dangerous Weapon). Ultimately the four criminal charges were consolidated, Gatcomb waived trial by jury, and after pleading "not guilty and not guilty by reason of mental disease or defect" to each of the charges, trial was had before a single Justice of the Superior Court. Gatcomb was found guilty on all four charges and sentenced to terms of imprisonment totaling a minimum of twenty years in the Maine State Prison. He has appealed from each of these convictions. We deny each appeal.

 Appellant filed no statement of points to be relied upon on appeal but, since we have the benefit of the full record, he is not deemed to have waived any points properly saved on the record for appellate review. Rule 39(d), M.R.Crim.P.

As set forth in appellant's brief, issues 2 through 5 challenged the sufficiency of the evidence relating to each offense. Appellant also argues that it was error to have found him guilty of these crimes rather than not guilty by reason of mental disease

1. Since this offense was alleged to have been committed on March 9, 1976, and since the new Maine Criminal Code did not become effective until May 1, 1976, the provisions of Section 2656 remained applicable.

or defect. Finally, Defendant contends it was manifest error for Justice below to have allowed the State to introduce into evidence "incriminating statements made during an examination by a psychiatrist affiliated with the hospital in which [he] was committed."

## FACTS

On March 9, 1976, a patient at the Bangor Mental Health Institute was found by attendants on the bed of a room assigned to and occupied by the appellant, bleeding from a five to six-inch laceration of the neck, which had been inflicted by a piece of broken glass which was found in the room. One witness described the victim as "beaten pretty badly," and also testified:

"Well, his face was all distorted, of course. He was propped up on his right arm, and the right side of his face was so puffed out and swollen that from the doorway I couldn't really be sure who it was. I had suspicions who it was but I couldn't really say it was him from his appearance at that distance until I got in there."

Chemical tests of the appellant's hands indicated the presence of blood. A psychiatrist who was on duty that evening had this incident called to his attention. After first observing the wounded patient and ordering him transferred to the Eastern Maine Medical Center, he then met the appellant who, in response to questions, made certain inculpatory statements which will be discussed in detail at a later point herein.

A police officer, after preliminarily satisfying the Justice presiding that the statement was properly admissible, testified that the appellant said to him when asked why he had been involved in this assault,

"I don't know, I just did it, I want to go to jail, I don't belong here, I'm not crazy," and "I cut his throat."

The three other offenses arose from completely independent and unrelated acts. On May 6, 1976, appellant, accompanied by a fellow patient, escaped from the Bangor Mental Health Institute. Subsequently, Gatcomb burglarized the home of one George D. Fallon, Jr., and took therefrom a rifle and a box of ammunition. Later on that same evening one Steven N. McDonough observed what appeared to be an attempt to steal his truck. When the appellant and his companion refused to desist, McDonough fired a shot in the air. Almost immediately the shot was returned from the area of the vehicle. Asked whether he was being shot at, he testified, "Well, at first I didn't but the second time I heard the bullet go over my head, so I had a good idea that they wasn't fooling." He then said, "I think I kind of pulled my neck in." The police were called and it was determined that the shots had been fired by the appellant from the rifle taken from the Fallon home.

## SUFFICIENCY OF THE EVIDENCE

Since the trial was "jury waived," the issue of the sufficiency of the evidence may be considered on appeal even though motions for judgment of acquittal were not made. *State v. Morgan,* Me., 379 A.2d 728, 730 (1977).

Dealing with the alleged violation of 17 M.R.S.A. § 2656, the appellant argues that there was insufficient evidence to indicate that when he committed the assault he then had the specific intent to kill the victim. Appellant is correct when he argues that the state must prove beyond a reasonable doubt that he harbored a specific intent, i. e., a subjective state of mind of intent or design to kill. *Bessey v. State,* Me., 297 A.2d 373, 376 (1972). This specific intent may be inferred, however, from the circumstances surrounding the act itself, which may show by its very nature of the requisite intention. *State v. Pinnette,* Me., 340 A.2d 17, 21 (1975). The single Justice made a general finding of guilt but he did not "find the facts specially," nor was he requested to do so. Rule 23(c), M.R.Crim.P. As was the case in *State v. Gagne,* Me., 362 A.2d 166, 174 (1976), our review of the evidence leads us firmly to the conclusion that this finding must stand.

Relating to the other three charges, appellant argues primarily that the State failed to prove the necessary intent which must accompany each of the alleged offenses. Extended discussion is unnecessary. Appellant had absolutely no right to enter the Fallon home. He obviously removed the rifle therefrom. The intent to steal must exist at the time of the entry and there was ample evidence to support the factfinder in his general finding of guilt in this connection. This same observation is appropriate to the charge of theft.

With reference to the criminal threatening charge, the appellant himself, through his own testimony, supplied ample evidence of the necessary intent, although the same could well have been inferred from the testimony of Mr. McDonough. He testified as follows:

"Did I shoot him? No, I shot in the general direction towards where his trailer was but I could not see him because it was dark from where I was and there was tree lines and bushes and stuff, I couldn't really see."

Dealing with the sufficiency of the evidence argument, we very recently said:

"Acting as an appellate court to review the sufficiency of the evidence, we are not to act as fact-finders in the first instance; it is the [fact-finder's] judgment, so long as it is a rational judgment, which must govern."

*State v. Clark,* Me., 386 A.2d 317, 323 (1978). Such is the case here.

DID THE EVIDENCE REQUIRE A FINDING THAT THE APPELLANT WAS NOT GUILTY OF THE CRIMES CHARGED BY REASON OF MENTAL DISEASE OR DEFECT?

The Justice presiding heard the competing testimony of two psychiatrists. Dr. Ep-

iphanes K. Balian, a qualified psychiatrist, testified for the defense. He had spent approximately twenty hours with the appellant in an effort to diagnose his condition. He expressed an opinion that Gatcomb suffered from "an organic brain disease which has affected his thinking, his feelings, and his behavior." This condition was compared to that which "individuals manifest when they're having an episode of a seizure." He was of the opinion that "this condition would substantially affect his mental and emotional processes and substantially impair his ability to conform his conduct to that which the law expects."

The State, in rebuttal, offered the testimony of Dr. Ulrich B. Jacobsohn who, it was agreed, was a qualified psychiatrist. In disagreeing with the testimony of Dr. Balian, he testified:

"I think personality disorders would be very close to my own findings of what I think may be the difficulty here.

I think the important thing is that at no time was there any evidence to show that Mr. Gatcomb was laboring under what we would call a psychotic disturbance or, for that matter, an organic brain disease."

Whether the appellant had a mental disease or mental defect sufficient to excuse his otherwise criminal conduct pursuant to 15 M.R.S.A. § 102,[2] or whether he suffered from either mental disease or defect and thus "lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the lawfulness of his conduct," under 17–A M.R.S.A. § 58(1),[3] were questions of fact which the single Justice must resolve.

Defendant's commitment to the Bangor Mental Health Institute does not

2. "An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. The terms 'mental disease' or 'mental defect' do not include an abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol." Section 102 was repealed and replaced by the enactment of 17–A M.R.S.A. § 58.

3. "An accused is not criminally responsible if, at the time of the criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct."

give rise to any presumption of a mental incapacity excusing him from responsibility for criminal conduct. *State v. Beauchene,* Me., 382 A.2d 329, 330 (1978). It is the responsibility of the factfinder to resolve questions of fact and determine whether or not the defendant has established by a fair preponderance of the evidence that he, in fact, lacked the requisite mental capacity to make him criminally responsible for his conduct. *State v. Durgin,* Me., 311 A.2d 266, 268 (1973). *See State v. Armstrong,* Me., 344 A.2d 42, 47 (1975). *See also State v. Buzynski,* Me., 330 A.2d 422, 428 (1974). 17–A M.R.S.A. § 58(3).[4] It was not error for the Justice below to have rejected the testimony of Dr. Balian and to have accepted the competing testimony of Dr. Jacobsohn.

ALTHOUGH ADMITTED WITHOUT OBJECTION, WAS IT MANIFEST ERROR TO ADMIT INCULPATORY STATEMENTS OF THE APPELLANT MADE TO DR. GEORGE CLOUTIER?

A psychiatrist, Dr. George Cloutier, served in some unexplained capacity at the Bangor Mental Health Institute one day each week. On March 9, 1976, he was in the institution and was called to attend the victim when he was discovered in Gatcomb's room. Having done so, he ordered him removed for treatment to the emergency ward of a local hospital. Dr. Cloutier then had a conversation with the appellant who was "in the seclusion room on E–2." The essence of his testimony is as follows:

"Well, the first thing that I asked him was what had happened and he said that he's cut the old man's throat and told me that he didn't—he said, don't ask me why. I hadn't asked him why yet. He said, don't ask me why, I don't know. And this is something that he repeated a number of times, I don't know why. He said, I just wanted to kill him. At one or more points, I just wanted to kill him.

He expressed to me the hope that he'd now go back to jail or upstairs to the special ward, E–3. He told me he wanted to get out of the hospital several times. That he's not crazy."

This testimony was adduced without any objection, nor did counsel for the appellant ever move to strike the same.

It is a fair conclusion that Dr. Cloutier on the day of this interview had no previous acquaintance with or exposure to Gatcomb and had not personally treated him either medically or psychiatrically.

■ If we *assume* (without any suggestion that the assumption has a valid legal basis) that the above quoted testimony was inadmissible evidence either because it was in violation of 32 M.R.S.A. § 3295,[5] or was introduced in evidence without complying with the mandate in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (as appellant has argued)[6] and, as

4. "The defendant shall have the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in subsection 1."

5. "Except at the request of, or with the consent of, the patient, no duly licensed physician shall be required to testify in any civil or criminal action, suit or proceeding at law or in equity respecting any information which he may have acquired in attending, examining or treating the patient in a professional capacity if such information was necessary to enable him to furnish professional care to the patient. However, when the physical or mental condition of the patient is at issue in such action, suit or proceeding or when a court in the exercise of sound discretion, deems such disclosure necessary to the proper administration of justice, no information communicated to, or otherwise learned by, such physician in connection with such attendance, examination or treatment shall be privileged and disclosure may be required.

Nothing in this section shall prohibit disclosure by a physician of information concerning a patient when such disclosure is required by law." Because of our assumption we do not have to decide whether § 3295 could avail appellant since he was not a patient of Dr. Cloutier and the statement was not obtained while either attending, examining, or treating him.

6. Appellant argues that even though Dr. Cloutier was not a law enforcement officer, the use of statements by the State in its case in chief which had been elicited by his questioning regarding a crime violates the spirit of *Miranda. But see State v. Tanguay,* Me., 388 A.2d 913 (July 24, 1978).

such, was an error of constitutional dimension, but not adequately saved for appellate review since admitted without objection, our task is to determine if the "nature and impact [of such testimony was] such, in all the circumstances, as fundamentally to have deprived [appellant] of a fair trial." *State v. Pomerleau,* Me., 363 A.2d 692, 698 (1976). In our review of this issue, we, of course, are mindful of the "harmless error beyond a reasonable doubt" doctrine of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We conclude that no rational factfinder could have returned a verdict of not guilty on the assault with intent to kill charge even if the testimony of Dr. Cloutier had never been admitted. Thus, we have no hesitancy in saying beyond a reasonable doubt that the error (if such it was) was harmless, and we reach this conclusion by either one of two approaches.

The record leaves no doubt that defense counsel had no realistic hope of an acquittal on the merits but was concerned primarily with establishing the truth of the plea of not guilty by reason of mental disease or defect. Relating to Dr. Cloutier's initial conversation with Gatcomb, he had also testified on direct examination as follows:

"A. Mr. Gatcomb seemed fully oriented as to the time, place, and person who was there. I found no evidence of any hallucinatory or delusional material. Nothing to indicate in any way that he was psychotic at that time. And my diagnosis at that moment was personality disorder, explosive type.

Q. As I understand it as a layman, personality disorder is not considered by a psychiatrist to be a mental disease or defect; is that correct?

A. Right."

The *entire* cross-examination of the doctor was directed solely at reducing the impact of the above quoted statement. Not one question was directed to the doctor in cross-examination which bore any relationship to the inculpatory statement previously quoted. This position is further supported because the appellant voluntarily became a witness and testified as follows:

"Q. Well, now there must have been some reason why you would cut this man Pannell. Do you understand what it was?

A. Honest to God, I really don't know, I really don't know. I really—I really cannot give you a truthful answer.

Q. Did you intend to kill him?

A. I don't think so. I don't think so.

Q. Had you planned to cut him?

A. That night that it happened I was on two or three different kinds of medication . . . and my head was a little weary and I was upset. I just—I don't know."

Following this testimony the appellant offered his own psychiatric expert, Dr. Epiphanes Balian, who reached the psychiatric conclusion that we have hereinbefore discussed. It is thus apparent to us that it was trial strategy not to make any effort to deny the act of cutting the victim across the throat with broken glass, but to seek a finding of lack of responsibility therefore because of mental disease or defect. Such being the trial strategy, it was obviously harmless error (if error at all) to admit the testimony of Dr. Cloutier.

The other approach to this problem is based on an analysis of the facts concerning the incident exclusive of the statement made to Dr. Cloutier by Gatcomb.

An employee of the institute was on duty in appellant's ward on this particular evening. Appellant came to him and said, I cut [the victim]." He then took the employee to his own room where the victim was observed on Gatcomb's bed, bleeding profusely from a laceration of the neck. The appellant asked to be put in seclusion and this was done but, before doing so, he told the attendant that he obtained a piece of glass, which he used to do the cutting, by smashing a vase on the windowsill in the washroom.

Another employee of the institute described the victim as a "very passive individual," sixty-four years of age. He also observed the bleeding victim in Gatcomb's room.

A pathologist examined the appellant on the morning following this episode and conducted a "benzidine" test on him, with the result that the test was positive for blood on Gatcomb's hands. He was not cross-examined.

The State next introduced the testimony of a detective from the Bangor Police Department. The court found preliminary that the detective had properly warned Gatcomb of his so-called *Miranda* rights. He then quoted Gatcomb as telling him: "I did it, I just did it and I don't know why," and, "I cut [the victim]," and further added, "I don't know, I just did it, I want to go to jail, I don't belong up here, I'm not crazy."

From the foregoing summary of the facts it becomes clear beyond possibility of dispute that the appellant was the person who brutally assaulted and inflicted the five to six-inch laceration on the throat of a sixty-four year old victim who was a very passive inmate in this institution. We need only ask one question, why would a person not suffering from mental disease or defect do such an act if not done with an intent to kill? We thus revert to our original position that it would have been completely irrational for a factfinder to have reached any other result but that of guilt, based on the testimony in this record and excluding that of Dr. Cloutier. *State v. Gagne, supra.*

As thus viewed, the admission of this testimony was harmless error beyond a reasonable doubt.

The entry is:

Appeals denied.

Judgments affirmed.

GODFREY, J., did not participate.