**STATE of Maine**

v.

**John FOSTER.**

Supreme Judicial Court of Maine.

Sept. 5, 1979.

Thomas E. Delahanty, II, Dist. Atty., Herbert Bunker, Jr. (orally), Deputy Dist. Atty., South Paris, for plaintiff.

David W. Austin, Rumford (orally), for defendant.

Before POMEROY, WERNICK, GODFREY and NICHOLS, JJ.

GODFREY, Justice.

Defendant Foster was indicted on October 6, 1976, for attempted criminal homicide in the second degree (17–A M.R.S.A. §§ 152(1), 202).[1] He entered pleas of not guilty and not guilty by reason of insanity. The defendant elected to have a two-stage trial, pursuant to section 59 of title 17–A, choosing to have the issue of criminal responsibility tried by the court without a jury. After the first stage of the trial, an Oxford County Superior Court jury returned a verdict of guilty; after the second, the presiding justice found that the defendant was responsible for his behavior. We deny the defendant's appeal from the judgment of conviction.

The charge arose out of an incident which was characterized by the presiding justice as bizarre. On the evening of August 20, 1976, Richard and Patricia Young drove along Alcohol Mary Road, a dirt road maintained by the town of Greenwood, where a residence owned by Mr. Young's parents was located. Appellant's farm was also located on Alcohol Mary Road. Appellant and his friends had partially blockaded the road with a tractor and had started a bonfire on the side of the road. Mr. Young, who had known the appellant for thirteen years, stopped his automobile. Appellant approached the car with his .44 magnum revolver in his hand and stated:

> " 'Dickie, you think I'm freaked out, but if you don't turn off the motor and everybody get out of the car I'm going to blow your f-ing head off.' "

Mr. Young drove off rapidly, and appellant fired his revolver, damaging the automobile. One bullet went through the passenger window.

## I.  Instructions to the Jury

Evidence was presented at the first phase of the trial indicating that appellant may have been intoxicated at the time of the shooting. George Young, the father of Richard Young, testified that he had encountered the appellant shortly before the shooting and that the appellant was "under the influence." Patricia Young testified that his eyes were glassy. A state trooper also testified that when appellant was arrested at about 6:30 the following morning he was under the influence and unable to walk.

Appellant requested an instruction on the defense of voluntary intoxication, pursuant to section 58–A of title 17–A.[2] The presiding justice denied the requested instruction, stating that he intended to cover the subject in substance. The justice then instructed the jury as follows:

> "Now, some mention has been made about the presence or absence of intoxication as it relates to one's intent, specific intent. And lest you be misled, intoxication in this instance is not necessarily a

---

1.  Section 152(1) provides, in pertinent part:
    "A person is guilty of criminal attempt if, acting with the kind of culpability required for the commission of the crime, and with the intent to complete the commission of the crime, he engages in conduct which, in fact, constitutes a substantial step toward its commission."
    Section 202, since repealed, was in effect at the time of the offense and provided, in pertinent part:
    "1.  A person is guilty of a criminal homicide in the 2nd degree if:
    A.  He causes the death of another intending to cause such death, or knowing that death

will almost certainly result from his conduct
. . . .."

2.  At the time of the alleged offense, 17–A M.R.S.A. § 58–A provided, in pertinent part:
    "1.  In a prosecution for a crime which may be committed intentionally or knowingly, where such culpable state of mind is a necessary element, the existence of a reasonable doubt as to such state of mind may be established by evidence of intoxication."
    Section 58–A was later amended by P.L.1977, ch. 510, §§ 26, 27.

defense but it is a condition that you may consider when you are making your judgment as to whether or not the requisite intent is present. There may or may not be a causal relationship between intoxication and the act or intent, but that is a judgment for you to make based upon all the attendant circumstances."

Appellant was not satisfied and requested an instruction in the exact language of section 58–A. The justice declined so to instruct the jury.

■ Voluntary intoxication is not a general defense. Intoxication of the appellant would have been a defense, under the provisions then effective of section 58–A, and those of sections 10,[3] 11(1)[4] and 202 of title 17–A, if it raised a reasonable doubt as to whether he intentionally or knowingly discharged the revolver (*i. e.,* intended the act) or as to whether he intended to kill or knew to a substantial certainty that death would result (*i. e.,* intended the result).

■ Appellant elected not to testify, and there was no evidence presented suggesting in what respect he lacked a requisite culpable state of mind. On the contrary, the only reasonable inference from his statement was that he intended both to shoot and to kill Richard Young. Nevertheless, the existence of criminal intent is a matter for the jury, and the presiding justice was justified in concluding that there was sufficient evidence to warrant an instruction on the defense of intoxication. *See State v. Rice,* Me., 379 A.2d 140 (1979).

■ The instruction given by the justice, when considered with the court's instructions on reasonable doubt and the culpable

mental state required for attempted murder, was equivalent to the requested instruction. We find no error in the justice's refusal to charge in the statutory language. *State v. Smith,* Me., 400 A.2d 749, 756 (1979).

■ We do not mean to suggest, however, that an instruction in the statutory language or its equivalent is always satisfactory when the defense of voluntary intoxication has been generated. The interrelationship of sections 10, 11(1) and 58–A of title 17–A may be difficult for a layman to grasp. *Wing v. Morse,* Me., 300 A.2d 491, 502 (1973). Where the theory of the defense focuses on the absence of a culpable state of mind in respect to an element of the offense or an essential attendant circumstance because of intoxication, the presiding justice should provide, when requested by the defendant, additional explanation to the jury so as to prevent misunderstanding of the legal principles involved.

Appellant also challenges the trial court's instructions on the state of mind required for an attempt to commit criminal homicide in the second degree. The relevant portion of the charge is as follows:

"When we talk about one acting with the kind of culpability required we are saying that you must be satisfied that the requisite intent or knowledge was present at the time . . . .'"

Though appellant made no objection at trial, he now contends that the use of the word "satisfied" suggested a standard of proof less than reasonable doubt. However, the presiding justice clearly instructed the

---

**3.** Section 10 provides, in pertinent part:

"§ 10. *Definitions of culpable states of mind*

1. 'Intentionally.'

A. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

B. A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes that they exist.

2. 'Knowingly.'

A. A person acts knowingly with respect to a result of his conduct when he is aware that

it is practically certain that his conduct will cause such a result.

B. A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist."

**4.** Section 11(1) provides, in pertinent part:

"A person is not guilty of a crime unless he acted intentionally, knowingly, recklessly, or negligently, as the law defining the crime specifies, with respect to each element of the crime, except .as provided in subsection 5."

jury that all elements of the offense must be proved beyond a reasonable doubt.

"And the State must prove each issue in the case beyond a reasonable doubt, because if you are not satisfied beyond a reasonable doubt then you have no alternative but to make a judgment of not guilty."

The adequacy of a jury instruction must be determined by reviewing the charge in its entirety rather than isolated extracts. *State v. Barlow,* Me., 387 A.2d 759 (1978); *State v. Scott,* Me., 343 A.2d 177 (1975). When the court's instruction is considered in its entirety, it was not erroneous and, consequently, did not result in manifest injustice to the appellant. *State v. Doughty,* Me., 399 A.2d 1319 (1979).

## II. Sufficiency of the Evidence of Criminal Responsibility

Appellant's second contention is that he satisfied his burden of proving that he lacked criminal responsibility. Whether a defendant, as a result of mental disease or defect, "lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct" under 17–A M.R.S.A. § 58(1) is a question of fact. *State v. Gatcomb,* Me., 389 A.2d 22 (1978). The burden of proof is on the defendant by a preponderance of the evidence. 17–A M.R.S.A. § 58(3).

Dr. Ulrich B. Jacobsohn, a forensic psychiatrist, testified for the defendant in the second phase of the two-stage trial. In Dr. Jacobsohn's opinion, the defendant had experienced on the evening of August 20, 1976, an acute psychotic reaction which the doctor considered to be a mental disease. The doctor further testified that appellant's thought processes were consistent with a delusional state that he was back in the marines and had a duty to guard a tower which was at the end of the road on which the shooting incident took place. Dr. Jacobsohn stated that the appellant did not have a continuing mental illness and he recommended medical treatment on an outpatient basis rather than hospitalization.

On cross-examination it was brought out that a psychotic reaction was not the only possible explanation for appellant's behavior on August 20, 1976. Appellant had used LSD frequently in the past, and the delusional state the doctor described was also consistent with the use of that drug. Dr. Jacobsohn conceded that the use of marijuana might possibly trigger an LSD flashback. Appellant's dilated pupils at the time of his arrest were also consistent with LSD use. When appellant was admitted to a hospital following his arrest, a drug reaction was suspected but no blood tests were taken. Almost all the evidence concerning possible intoxication by drugs was developed at the second phase of the trial and thus not presented to the jury on the issue of intent.

The presiding justice concluded on the basis of evidence presented at both phases of the two-stage trial that the appellant was criminally responsible for his behavior. In response to the appellant's motion, the justice filed written findings of fact. We quote the relevant portions of those findings:

"I find that the evidence was abundant and uncontroverted that the Defendant had been a heavy user of drugs in the past and although Doctor Jacobsohn assumed that the Defendant had not been using drugs for some time there was no evidence to support it.

On the night in question there were different explanations by the Defendant for his behavior. He explained to a Mrs. Young who testified that he was blocking the road to prohibit sightseers from going to the tower unless they paid him a toll. He told Doctor Jacobsohn that he thought he was in the Marines and guarding the tower. Another incident which occurred the previous day or so earlier, he explained in two different ways. He told the police that he shot his friend in the foot because he attacked his daughter. He told Doctor Jacobsohn that he shot him because he had brought drugged mushrooms to them.

There is evidence that following the shooting at his neighbors on the night in question, he realized there would be trouble and he took his friends back to the house. He put out all the lights in the house and told his friends to scatter in the bushes. When the police came, a short time later, he answered their call to come out by shooting at them. He shot his dog at this time so the dog's barking would not give away his position. He kept shouting to his girl friend to 'shoot the pigs.' . . .

. . . . .

At the first trial there was more evidence as to the behavior of the Defendant and his friends on the night in question. Not only was the Defendant acting strangely but so were his companions. They paraded around and stood at attention. The Defendant's girl friend employed the use of some sort of sword or blade as a part of her uniform. There was no evidence whatsoever that his friends and companions were acting through fear of the Defendant and therefore unwillingly participating in the events of the evening.

There was evidence that a case of beer had been delivered to the Defendant's home late in the afternoon of the 19th. From all the evidence proved it is reasonable to conclude that something other than alcohol had been consumed or was involved and contributed to their bizarre behavior—namely drugs. If one concludes that the Defendant experienced a psychosis brought on by stress, it's interesting to ponder the cause of his companions' behavior.

I am not satisfied that the Defendant has met his burden and shown by a preponderance of the evidence that he lacks criminal responsibility for his behavior. M.R.S.A. 17–A § 58(3).

There is much testimony which need not be repeated here about what may or may not have been the reason for the bizarre behavior. But as Doctor Jacobsohn said, 'Medicine is an art, it's not an exact science. Clinical judgment enters into it, characteristic patterns that are not verifiable but are the result of experience from having seen many cases before enters into it, so you take all of the information you have, look at it objectively and say, now, what are we left with, and that's the diagnosis that we arrive at.'"

▌ Before the enactment of the Maine Criminal Code, this Court had delineated the proper roles of the jury and the expert psychiatric witness in applying the Maine statutory version of the *Durham* rule. *State v. Durgin,* Me., 311 A.2d 266 (1973). Although "experts may describe the mental and emotional condition of an accused at the relevant time," it is the responsibility of the jury to decide the ultimate question whether the criminal conduct was the product of mental disease or defect. *State v. Armstrong,* Me., 344 A.2d 42, 47 (1975).

Nevertheless, the problem of undue domination of insanity trials by expert witnesses was the primary cause of the rejection of the *Durham* rule in *United States v. Brawner,* 153 U.S.App.D.C. 1, 14–15, 471 F.2d 969 (D.C.Cir. 1972). The drafters of the Maine Criminal Code followed *Brawner* in adopting the American Law Institute rule. 17–A M.R.S.A. § 58, Comment, 1st para. (Supp.1978). *Brawner* was based on the principle that a determination of criminal responsibility should be made by the jury, assessing the defendant's impairment, as explained by the experts, in light of community standards of blameworthiness.

"The doctrine of criminal responsibility is such that there can be no doubt 'of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments,' . . . Hence, as *King* [*King v. United States,* 125 U.S. App.D.C. 318, 372 F.2d 383 (1967)] and other opinions have noted, jury decisions have been accorded unusual deference even when they have found responsibility in the face of a powerful record, with medical evidence uncontradicted, pointing toward exculpation. The 'moral' elements of the decision are not defined exclusively by religious considerations but by the totality of underlying conceptions

of ethics and justice shared by the community, as expressed by its jury surrogate. The essential feature of a jury 'lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.' . .

"The expert witnesses—psychiatrists and psychologists—are called to adduce relevant information . . . to put before the jury the information that is within the expert's domain, to aid the jury in making a broad and comprehensive judgment." *Id.* at 982–83 (notecalls omitted).

We see no justification for applying a different standard of appellate review where, as here, the defendant elects to have the issue of criminal responsibility tried by the court without a jury, *Brawner* thus reinforces prior Maine law that considerable deference must be accorded to the fact finder's determination of criminal responsibility.

In view of these considerations and of the evidence presented, which in its entirety was reasonably subject to more than one interpretation, we cannot conclude that the presiding justice erred in finding that appellant did not meet his burden of proving lack of criminal responsibility.

### III. *Constitutionality of Placing the Burden of Proof on the Defendant*

Appellant also contends that section 58(3) violates the due process clause of the Fourteenth Amendment by placing the burden of proving the absence of criminal responsibility on the defendant. We have repeatedly held, most recently in *State v. Tracy,* Me., 372 A.2d 1048 (1977), that such an allocation of the burden of proof is constitutionally permissible.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and ARCHIBALD and DELAHANTY, JJ., did not sit.