STATE of Maine

v.

Albert Lee FLICK.

Supreme Judicial Court of Maine.

Argued May 6, 1980.

Decided Jan. 26, 1981.

Charles K. Leadbetter (orally), Paula Van Meter, Asst. Attys. Gen., Augusta, for plaintiff.

Dunlap, Wood & O'Brien, Gary C. Wood (orally), Mark E. Dunlap, Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS and ROBERTS, JJ.

ROBERTS, Justice.

In Superior Court, Cumberland County, Albert Lee Flick was convicted of murder, 17-A M.R.S.A. § 201. The indictment charged alternatively that Flick either intentionally or knowingly caused the death of his wife Sandra Flick (§ 201(1)(A)), or engaged in conduct which manifested a depraved indifference to the value of human life and which in fact caused the death of Sandra Flick (§ 201(1)(B)). On appeal, Flick raises several issues concerning pretrial procedures, admissibility and sufficiency of evidence, and instructions to the jury. We affirm the judgment of conviction.

*Facts*

On January 10, 1979, Sandra Flick had her husband served with divorce papers and physically escorted from their apartment in Westbrook by the police. In the following month, Flick returned several times, sometimes with the result that Sandra called the police. They were disputing, among other things, the custody of the children.

On Monday, January 29, Sandra asked Flick to come and remove certain of his belongings from the apartment. On Wednesday morning he drove to Westbrook with a gun and a knife in the car. He parked three-quarters of a mile from his wife's apartment, and took the knife with him.

Elsie Kimball, Sandra's daughter by a prior marriage, testified that she was in the back bedroom when Flick knocked on the door. She stayed in the back room when he came in. He asked about some fishing poles which her mother brought out to him in the living room. While Elsie, still hidden in the back bedroom, watched through a crack in the door, Flick took out his knife and began showing Sandra how to remove the hooks from the fishing lines.

Elsie testified that her mother bent over one of the poles to take one of the hooks off, as Flick was telling her to do. Then Flick seized her arm and bent it behind her back, putting his other hand over her mouth. He pushed her over to the chair, saying that he loved her and didn't want to have to hurt her. Sandra managed to scream out Elsie's name, and the girl ran out of the bedroom. She saw Flick sitting on her mother on the chair. She heard him say "Now you've had it," then she ran to the apartment downstairs.

Mrs. Daniels, the occupant of the second floor apartment, called the police. Her husband, Alphee Daniels, went upstairs. He testified that Elsie told him Flick was going to kill her mother. As soon as Daniels reached the third floor stairs, he met Flick coming down the stairs with blood on his hands and blood stains on his pants. Flick began asking for help for Sandra, claiming that he didn't mean to do it. Daniels found

Sandra covered with blood, cut in the throat, but still alive. She said she knew she was going to die, and said that Flick had stabbed her. The police, who arrived shortly thereafter, found Flick's 3½ inch long jackknife in the living room.

The medical examiner testified that Sandra had numerous cuts and stab wounds, including four stab wounds on the neck and in the chest area, one through the heart, and some wounds which could be characterized as "defense wounds," likely to occur if the victim was trying to defend herself against attack.

Flick testified that while he and Sandra were taking the hooks off the fishing poles, he tried to begin a discussion. The day before they had had an argument, and she had threatened to harm herself and the children. At some point he pushed her into the chair. When he and Sandra had reached the point of hollering at each other, Sandra told Elsie to go downstairs. Flick started to walk away, and Sandra picked up the knife and threatened to kill him. Then he grabbed her arm and both of them fell. He ended up on top of her. Flick said he knew Sandra had been cut, and "after that I don't know what happened." Five minutes later she was standing in front of him all covered with blood. He made her sit down and went for help.

## I. *Sufficiency of the Evidence*

■ Flick first contends that the evidence was insufficient to show that he acted knowingly or intentionally or with "depraved indifference." We find that the testimony of the State's witnesses, summarized above, was sufficient. Defendant attacks other evidence that the prosecution advanced to show intent, but his argument is not persuasive. If the jury believed the medical examiner and Elsie's testimony, they could reasonably infer that after Elsie was out of the apartment, Flick began intentionally stabbing his wife. Alphee Daniels' testimony confirms this conclusion. Nothing else is necessary.

Evidence is not insufficient because the defendant's state of mind is shown by circumstantial evidence. *State v. Doughty,*

Me., 399 A.2d 1319, 1326 (1979). When reviewing for sufficiency on appeal, the evidence is viewed most favorably to the prosecution, and is sufficient unless no trier of fact rationally could find proof of guilt beyond a reasonable doubt. *State v. Lagasse,* Me., 410 A.2d 537, 542 (1980).

## II. *Motion to Suppress Evidence*

■ Flick sought by pretrial motion to suppress physical evidence seized from his car. He concedes that the police first entered his car with his consent. Flick contends, however, that the police only had permission to remove his gun, and not to search the car for a box of ammunition. The police claim they were also told about the ammunition. While searching for the ammunition, they opened the glove compartment and there observed a box for the knife. Leaving the box where it was, they took the car to the police station and obtained a search warrant. The defendant suggests that the warrant was the fruit of an illegal search of the glove compartment.

At the conclusion of the suppression hearing, the presiding justice found by a preponderance of the evidence that Flick had given the police permission to search for the ammunition. Since this finding is not clearly erroneous, we must reject the claim of error. *State v. Fredette,* Me., 411 A.2d 65, 68 (1979).

## III. *State Participation in Witness Interview*

■ The defendant filed a pretrial motion seeking to prohibit or limit State participation in counsel's interview of Sandra Flick's daughter, Elsie. The prosecution had been requested by the child's relatives, who had custody of her, to provide a State police officer or other representative to be present during the interview. After a hearing, the motion was denied. Flick argues on appeal that the State's presence violated his right to due process, to confront the witnesses against him and to the effective assistance of counsel.

Flick does not claim that the prosecution told the girl not to talk to defense counsel. The defendant claims only that the State's

action "so restricted the defendant's ability to question [the witness] that it was tantamount to instructions not to talk to defense counsel." The defendant does not claim that any specific actions taken by the State during the interview interfered with counsel's ability to question the witness. Flick suggests only that the girl would have been unlikely to change her story in front of the State police officer who had previously interviewed her. There is no evidence, however, to suggest that the State intimidated the child or in any way discouraged her from telling the truth.

The Superior Court justice, after denying defendant's motion, said that the defendant could come back with a new motion if he had anything new that would support his assertion of prejudice. Flick made no new motion, and on appeal he makes no attempt at a specific showing of prejudice. Instead, he asks for a per se rule that the Court's refusal to bar the State's presence at the interview constitutes reversible error.

We decline to adopt such a rule. In the circumstances of this case, absent any showing whatever of prejudice, we cannot speculate on what prejudice may have occurred. The State's presence may well have facilitated rather than interfered with counsel's interview. A witness, or her custodian, may refuse such an interview entirely or impose any conditions deemed necessary. While we find no error here, our decision in this case does not condone any actual interference by the prosecution in defense preparation.

IV. *Exclusion of Psychiatric Testimony*

■ The defendant presented two expert witnesses, a psychiatrist and a clinical psychologist, who testified that Flick's intelligence borders on retardation. No attempt was made to establish a mental disease or defect. The State presented a rebuttal witness, a psychiatrist who testified that the defendant is of average intelligence.

Before calling the witnesses, defense counsel asked, in effect, if the witnesses could be asked to state their opinions as to whether Flick acted intentionally or knowingly at the time of the killing, or acted in extreme anger or fear. The presiding justice refused to permit such questions, saying:

> Your experts are not legal experts. . . . They may testify concerning their medical and psychological evaluation of Mr. Flick, whether he suffered from some abnormality . . . how that abnormality manifests itself in terms of effect on his mental processes. The jury will then draw the conclusion as to whether he acted knowingly or intentionally.

The defendant maintains that this ruling violated M.R.Evid. 704, which reads:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Rule 704 affects only opinions of an expert witness "otherwise admissible." The presiding justice may exclude an expert's opinion under M.R.Evid. 702 if he finds that it would not be within the expert's specialized knowledge or would not be helpful to the jury. He may also exclude it if he finds it irrelevant under M.R.Evid. 401 and 402, or if its probative value would be outweighed by the countervailing considerations of M.R.Evid. 403. *See* R. Field and P. Murray, *Maine Evidence* § 704.1.

In criminal cases, courts have frequently held that medical and psychiatric witnesses must not frame their testimony in terms of the legal conclusions to be drawn by the fact-finder. Before the adoption of the Maine Criminal Code, Title 17–A M.R.S.A., and the Maine Rules of Evidence, we said in *State v. Durgin*, Me., 311 A.2d 266, 268 (1973):

> Expert testimony may be utilized to describe the mental and emotional condition of the accused at the time the conduct complained of was committed, except that the expert should not give his opinion as to the cause of the conduct.

In *Durgin*, we relied on *Washington v. United States*, 390 F.2d 444 (D.C.Cir.1967). Both *Durgin* and *Washington* dealt with the role of expert psychiatric witnesses un-

der the formulation of the insanity defense in *Durham v. United States*, 214 F.2d 862 (D.C.Cir.1954), adopted in this state, with modifications, by P.L.1963, ch. 311, § 3. Under *Durham*, the ultimate issue was whether the defendant's conduct was the product of a mental disease or defect. 214 F.2d at 875. *Durham* was superseded by *United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972), and in Maine by the adoption of 17–A M.R.S.A. § 58, effective May 1, 1976. In *Brawner*, the court said:

> The rule of *Washington v. United States* . . . that experts must not frame their testimony in terms of "product," was aimed at relieving a stubborn and recurring problem—that of experts using their facility with the esoteric and imprecise language of mental disease to exert an undue dominion over the jury's deliberations.
>
> .    .    .    .    .
>
> . . . The rule contemplating expert testimony as to the existence and consequence of a mental disease or defect is not to be construed as permission to testify solely in terms of expert conclusions. Our jurisprudence to the contrary is not undone, it is rather underscored. It is the responsibility of all concerned—expert, counsel and judge—to see to it that the jury . . . is informed of the expert's underlying reasons and approach, and is not confronted with ultimate opinions on a take-it-or-leave-it basis.

471 F.2d at 1003–1006. *See also Harried v. United States*, 389 F.2d 281 (D.C.Cir.1967); *State v. Foster*, Me., 405 A.2d 726 (1979).

The Maine Rules of Evidence are consistent with the opinions in *Durgin, Washington* and *Brawner.* Under M.R.Evid. 701 and 702, the presiding justice may exclude opinions which state *legal* conclusions, beyond the specialized knowledge of the expert. He may also exclude opinions which are arguably within the expert's specialized knowledge, but which are so conclusory, or so framed in terms of the legal conclusions to be drawn, that they will not "assist the trier of fact" (M.R.Evid. 702), or will pose a danger of confusing the jury which out-weighs their probative value (M.R.Evid. 403), or if there is an insufficient factual basis to support the conclusions (M.R.Evid. 705(b)).

Under these rules, the presiding justice in the present case did not abuse his discretion in excluding the defendant's questions. The defendant made no offer of proof to show that the opinions he sought to elicit would meet the requirements set forth above, and from the information before him, the presiding justice correctly concluded that defense counsel sought to elicit legal conclusions beyond the specialized knowledge of the experts.

Defense counsel also requested that he be allowed to question his experts on the issue of whether Flick acted voluntarily, as required for criminal liability by 17–A M.R.S.A. § 51. He added that it was his understanding that section 51 required "an exercise of choice, an act of judgment, willful act . . . ." The presiding justice ruled that the expert witnesses could describe any mental illness which they had diagnosed in Flick, but that they could not express an opinion as to the voluntariness of particular conduct. The justice pointed out that the legal concept of voluntariness under section 51 is intended "to distinguish such conduct from reflex action, non-volitional action." He ruled that expert testimony relevant to that legal concept would be admissible, but that testimony about voluntariness in some other sense would not be admissible. The presiding justice correctly rejected defense counsel's interpretation of section 51 and correctly excluded expert testimony concerning concepts of judgment and choice. *See State v. Mishne*, Me., 427 A.2d 450 (January, 1981).

### V. Exclusion of Testimony on Provocation

The presiding justice excluded testimony from two witnesses. The first was offered to show the conditions at Sandra Flick's apartment, and the second to show that Sandra Flick had threatened to kill herself and the children before allowing Flick to have custody. Both facts were testified to by the defendant.

The defense offered this evidence as relevant to the defendant's state of mind and, on appeal, argues that the evidence could be considered by the jury "in determining adequate provocation." The presiding justice evidently determined that there was no sufficient probative relation between the proffered evidence and the issue of provocation under section 203.

17–A M.R.S.A. § 203 provides in part:

1. A person is guilty of manslaughter if he:

. . . . .

B. Causes the death of another human being under circumstances which would otherwise be murder except that the actor causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation.

2. For purposes of subsection 1, paragraph B, provocation is adequate if:

. . . . .

B. It is reasonable for the actor to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall not be sufficient, in and of itself, to establish the reasonableness of his reaction.

Reasonableness and adequacy of provocation under section 203 are conclusions of fact to be drawn by the trier of fact. In determining whether evidence of preceding events is relevant to adequacy of provocation, the presiding justice must first determine whether those events could be considered part of the provocation as a matter of law. Provocation under section 203 must be adequate to provoke a reaction of extreme anger or fear, which necessarily implies that the provocation must be immediate. Remote events cannot be a part of such provocation. In respect to the reasonableness of the actor's reaction of extreme anger or fear, preceding events may be relevant. However, as we said in *State v. Kotsimpulos*, Me., 411 A.2d 79, 81 (1980):

Common sense suggests that one measures relevance in a continuum, and that at some stage evidence becomes so remote that its probative impact . . . is reduced to zero. When the probative impact reaches zero, the evidence is simply not admissible under Rule 402; but prior to that point, the admission of the evidence may be weighed against other factors under Rule 403.

Assuming the proffered evidence may have some relevance to reasonableness under section 203, it was nevertheless within the presiding justice's discretion to exclude the evidence under M.R.Evid. 403. Such a ruling will be reviewed only for abuse of discretion. *State v. Kotsimpulos, supra.* Here, the presiding justice reasonably could have found that the probative value was outweighed by the danger that the evidence would confuse the jury by suggesting that they consider the evidence as a form of justification or mitigation. There was no abuse of discretion in his decision to exclude the testimony.

VI. *Instructions on Adequate Provocation*

■ The defendant asked for instructions based on *Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972), to the effect that in deciding what constitutes adequate provocation, reliance may be placed on the cumulative impact of a series of related events. The presiding justice found that the instruction proposed by the defense amounted to comment on the evidence, which would be proper for defense counsel to argue to the jury, but would not be proper for the presiding justice's instructions.

During its deliberation, the jury sent the following question to the presiding justice: "Can the jury consider marital problems part of the legal provocation?" The presiding justice, again refusing to comment on the evidence, responded by instructing in the language of 17–A M.R.S.A. § 203(2)(B) that

provocation is adequate if it was reasonable for Mr. Flick to react to the provocation with extreme anger or extreme fear. . . . [E]xtreme anger or extreme

fear of such intensity that it obscures the individual's reasoning and impels him to act with physical violence.

The provocation must be such that you can say it is reasonable for the person to react to it by having the reason obscured, and being impelled to act with physical violence.

The question here is not whether the issue of provocation can be generated by evidence of cumulative preceding events. The presiding justice did not refuse to instruct on provocation, or prevent counsel from presenting his argument to the jury. Flick argues, however, that the instructions erroneously suggested to the jury that they should not consider the prior incidents at all.

We reject the defendant's characterization of the charge. The presiding justice properly followed the definition of adequate provocation in § 203(2), directing the jury to decide whether it was reasonable for Flick to react with extreme anger or fear. He directed the jury's attention to the question of whether Flick's reason was obscured by provocation at the moment of the killing, but he left the jury entirely free to consider the effects of preceding events in deciding what provocation would be adequate to make extreme anger or fear reasonable. The defendant was not prejudiced either by the instructions given or by any omission. We need not decide whether it would have been proper to exclude consideration of such prior events altogether. However, "there are definite limitations on the type of conduct deemed legally *adequate* to mitigate the punishment for a felonious homicide . . . ." *State v. Hilliker*, Me., 327 A.2d 860, 865 (1974) (decided before the adoption of the present Maine Criminal Code; emphasis in original). The presiding justice properly avoided suggesting to the jury that the prior marital problems could, in and of themselves, be considered *provocation* adequate to reduce murder to man-

slaughter. Such evidence could only be relevant, if at all, to the question whether it would be "reasonable for the actor to react . . . with extreme anger or extreme fear" to such other provocation as might have occurred. The jury here was free to consider the evidence for that purpose.

### VII. *Instructions on Depraved Indifference Murder*

■ At trial, the presiding justice followed the holding in *State v. Woodbury*, Me., 403 A.2d 1166, 1171–1173 (1979), in his instructions to the jury on the charge of "depraved indifference" murder, § 201(1)(B),[1] instructing that

> it is not necessary to prove that the defendant, Mr. Flick, in fact himself had a depraved indifference to the value of human life, rather the jury should look at his conduct and ask—has the State proven that his conduct had such a high risk of causing death, was so heinous that mankind in general would say that such conduct could only result from a depraved indifference to the value of human life. . . .

On appeal, the defendant argues for the first time that *Woodbury* was wrongly decided, and that § 201(1)(B) must, under 17-A M.R.S.A. § 11, be construed to require proof of one of the culpable states of mind defined in 17-A M.R.S.A. § 10, since no legislative intent to impose liability without a culpable mental state "otherwise appears" (§ 11(5)(B)).

The charge must be reviewed for "obvious error . . . affecting substantial rights." M.R.Crim.P. 52(b); *State v. Lee*, Me., 404 A.2d 983, 984, n.1 (1979). A charge which strictly conformed to a current Law Court opinion squarely on point could hardly be called manifest error. We reject defendant's contentions, and decline to change our ruling in *State v. Woodbury, supra.*

### VIII. *Constitutionality of 17-A M.R.S.A. § 201(1)(B)*

■ Flick's last argument is his contention that the "depraved indifference" stat-

---

1. 17 A M.R.S.A. § 201(1)(B) provides as follows:

  1. A person is guilty of murder if:

  .   .   .   .   .

B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being; . . . .

ute is unconstitutionally vague. The record does not show that this argument was made at trial. It appears first in his post-conviction motion for a new trial pursuant to M.R.Crim.P. 33, filed the same day as the notice of appeal. Again, the argument must be reviewed for "obvious error affecting substantial rights," even though it is of constitutional dimension. *State v. DeCesere*, Me., 379 A.2d 1221 (1977), *State v. Pomerleau*, Me., 363 A.2d 692 (1976). Under this standard of review, the challenge must be rejected.

In *State v. Parker*, Me., 372 A.2d 570, 573 (1977), we said:

A criminal statute fails to give fair warning of its scope, in accordance with due process requirements, if "a person of ordinary intelligence" could not "reasonably understand" that it forbids the conduct for which he is criminally charged, *United States v. Hariss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

We cannot find that § 201(1)(B) falls so far short of this standard as to have denied defendant a fair trial. *See State v. Woodbury*, 403 A.2d at 1171–1173.

In conclusion, we have carefully examined the record and all of the arguments raised by the defendant on appeal, and we have found nothing which constitutes reversible error. The conviction must be affirmed.

The entry is:

Judgment of conviction affirmed.

All concurring.