**STATE of Maine**

v.

**Vaughn LeBLANC.**

Supreme Judicial Court of Maine.

Argued Nov. 9, 1988.
Decided May 31, 1989.

Paul Aranson, Dist. Atty., Caroline Gardiner (orally), Law Student Intern, Portland, for State.

James Erwin, Valerie S. Libby (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for defendant.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

ROBERTS, Justice.

Vaughn LeBlanc appeals from his convictions of burglary, 17–A M.R.S.A. § 401 (1983 & Supp.1988) and unlawful sexual contact, 17–A M.R.S.A. § 255 (Supp.1988), entered in Superior Court (Cumberland County, *Perkins, J.*) following a jury trial. Because we do not agree with LeBlanc's sole contention on appeal that the court erred in excluding expert medical testimony, we affirm the convictions.

### I.

In September 1986, Karen W. awoke in the night to find LeBlanc standing in her bedroom. He jumped onto the bed, held her arms back, pushed her down and lay on top of her. When she screamed, he covered her face so she couldn't breathe. Neighbors heard the screams, shouted upstairs that they were coming to help, and called the police. LeBlanc moved off Karen *to* her side, touched her vagina with his hand and said her name, "Karen."

When one of the neighbors reached the bedroom, he saw LeBlanc lying next to Karen and pulled at him. LeBlanc got off the bed and said, "If you want to be a hero, you're a dead man." The neighbor followed LeBlanc out of the building and down the street. LeBlanc alternately came toward him and ran slowly away from him, finally climbing over a fence and sitting down. When police officers arrived LeBlanc ran from them, bumped into a railing and fell down. LeBlanc verbally abused the police and told them that he wanted a lawyer and a doctor. The police noted that LeBlanc's pants were undone and that he smelled of alcohol.

### II.

At trial the defense stipulated that LeBlanc entered Karen's apartment and recklessly caused her offensive physical contact. In fact, he had entered a plea of guilty to a charge of assault on Karen. LeBlanc testified that he had earlier had a drink with a friend, found himself near an old girlfriend's apartment and had gone inside. He stated that he became confused and thought he was at home in his own bedroom with his wife. LeBlanc did not contest the fact that he may have touched Karen's vagina.

The defense attempted to introduce the testimony of Dr. David Getson. LeBlanc hoped to establish through Getson that he was subject to a condition called "polysystemic candidiasis," one consequence of which may be occasional periods of confusion and disorientation. Getson was trained as a general surgeon and practiced "general preventive medicine" at the time of trial, consulting with patients who have chronic illness. Acknowledging that the American Medical Association's umbrella label for that category of medicine is "general preventive medicine," Getson stated that "[c]hronic illness consultation is not a term of art in terms of the medical establishment but the only way I can really describe what I do." He further testified that he was trained as an emergency physician in diagnosing and treating infectious diseases and had clinical experience in diagnosing and treating infectious diseases.

After examining LeBlanc and his prior medical records, in April 1987, Getson arrived at a "working diagnosis" of polysystemic candidiasis. Getson stated that in a working diagnosis no objective results lead to the diagnosis, but rather a physician arrives at the diagnosis as a result of trying different treatments on the patient and seeing what works. He testified there is as yet no "definitive diagnosis for polysystemic candidiasis ... period." He acknowledged that the diagnosis is not generally accepted in the medical community.

Getson described polysystemic candidiasis as a condition in which the yeast organism overgrows in various systems and organs of the body and produces microtoxins. Getson stated that the microtoxins resulting from polysystemic candidiasis could cause confusion and disorientation. Getson stated that while the first article on polysystemic candidiasis was published about 20 years ago, and a definitive article was published 10 years ago, "this is more or less a leading edge, hypothesis in the medical world, and there are no real studies yet available to prove the cause-effect relationships ... we're describing. This is really more of an empirical, the whole diagnosis and treatment of this condition is more on an empirical level at this point, just the way diabetes was 50 to 100 years ago."

Getson testified that since there was an improvement in LeBlanc as a result of his working diagnosis and treatment, Getson felt no need to refer him to either an infectious disease specialist or a psychiatrist. Getson could not testify that LeBlanc's actions at the time of the incident were a result of polysystemic candidiasis or that LeBlanc did not know what he was doing because of polysystemic candidiasis. Getson testified that while alcohol consumption could "feed and fuel a yeast problem," he couldn't say whether that would occur in any particular individual.

### III.

LeBlanc contends that the court erred in sustaining the State's objection to the testimony of Dr. Getson. Although the State's objection was apparently stated off the record at trial, the State's principal contentions on appeal are threefold: (1) that the excluded testimony was not evidence of an abnormal condition of the mind; (2) that the excluded diagnosis lacked "general scientific acceptance;" and (3) that, if relevant, the testimony was properly excluded under M.R.Evid. 403. Only the last of these arguments is persuasive.

■ The State argues that Getson was unable to establish that LeBlanc had, at the time of the offense, such an extraordinary variation of mental process that he lacked the capacity to form the requisite intent. That argument misperceives the defense of mental abnormality. Pursuant to 17-A M.R.S.A. § 38 (1983), "[e]vidence of an abnormal condition of the mind may raise a reasonable doubt as to the *existence* of a required culpable state of mind." (emphasis added) Evidence of a confused or disoriented state of mind may raise a reasonable doubt as to what was in fact LeBlanc's intention, without necessarily casting doubt on his *capacity* to form that intention. *Cf. State v. Flick*, 425 A.2d 167 (Me.1981) (expert testifies concerning effect of abnormality on mental processes and jury determines existence of culpable mental state).

■ The State contends that the testimony was properly excluded because the medical term "polysystemic candidiasis" is not a generally accepted medical diagnosis. LeBlanc argues, however, that Getson's description of the methodology by which he arrived at a "working diagnosis" was sufficiently reliable to be of assistance to the jury. M.R.Evid. 702. We adhere to our determination in *State v. Williams*, 388 A.2d 500, 503-04 (Me.1978), that "general scientific acceptance" is not a prerequisite for the admission of expert testimony. In LeBlanc's case, we conclude that, regardless of medical terminology, Getson's description of a medical condition that could have caused LeBlanc to experience symptoms of mental abnormality has some relevance under section 38. Moreover, the record reveals that Getson's qualifications and methodology were an adequate basis for his testimony.

Finally, the State argues that the court's ruling was a proper exercise of discretion under M.R.Evid. 403. That rule permits exclusion of evidence if its probative value is substantially outweighed by the danger of undue delay and confusion of the issues. Under a Rule 403 analysis, we are not concerned whether Getson's testimony meets the minimal standards of relevancy contained in M.R.Evid. 702 and 401. Rather, we determine whether the testimony had such probative value in advancing a theory of defense that its exclusion was not within the court's Rule 403 discretion.

Although the State's argument focused on the scientific reliability of the diagnosis of systemic polysystemic candidiasis, we examine the reliability of the diagnosis as a predictor of the existence of confusion and disorientation. *See State v. Black*, 537 A.2d 1154, 1157 (Me.1988). On that score Getson's testimony is weak. He stated that the effect of microtoxins on an individual is "somewhat unpredictable" and that their synergistic effect with alcohol is "not really predictable." Although Getson testified that he had observed such symptoms in some of his patients, he presented no statistics and acknowledged the absence of scientific evidence of a cause-effect relationship. The learned treatise quoted by Getson refers to "fatigue and depression" as an effect of polysystemic candidiasis, not "confusion and disorientation." We conclude, therefore, that Getson's diagnosis of polysystemic candidiasis, even if accepted as reliable, had minimal probative value in advancing LeBlanc's defense. We find no reversible error in the court's conclusion that the obvious danger of delay and confusion outweighed that minimal probative value. *See State v. Woodburn*, 559 A.2d 343 (Me.1989).

The entry is:

Judgment affirmed.

All concurring.