STATE of Maine

v.

**Stephen JOY.**

Supreme Judicial Court of Maine.

Argued Sept. 24, 1982.

Decided Nov. 18, 1982.

Charles K. Leadbetter, Wayne S. Moss (orally) Asst. Attys. Gen., Augusta, for plaintiff.

Edward W. Klein (orally), Portland, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

Defendant, Stephen Joy, appeals from his convictions of murder, 17–A M.R.S.A. § 201(1)(A) & (B) (Supp.1982),[1] and arson, 17–A M.R.S.A. § 802 (Supp.1982), following a jury trial in Superior Court, Cumberland County. On appeal defendant challenges: (1) the instruction to the jury on depraved indifference murder, section 201(1)(B); (2) the sufficiency of the evidence to support the murder conviction; (3) the admission into evidence of a photo of the deceased's corpse; and (4) the trial court's failure to instruct the jury that an abnormal condition of mind may give rise to a reasonable doubt whether the State proved defendant's conduct was voluntary. We deny the appeal.

[1] 17–A M.R.S.A. § 201(1) (Supp.1982) provides,

A person is guilty of murder if:
  A. He intentionally or knowingly causes the death of another human being;

## I.

The victim, Philip Gagnon, died in a fire set during the early morning hours of Christmas day, 1980. The jury would have been warranted in finding the following facts leading to that tragic end. Lorraine Flaherty met defendant at a Portland bar on December 23, 1980. She had known him approximately nine years, but had not seen him for over a year. That evening, he stayed overnight in her second floor apartment on Congress Street in Portland. Basil Moran, Lorraine's ex-husband, was also temporarily living in the apartment at this time.

Michelle Bellanceau, Lorraine's daughter, lived with her two children in the first floor apartment. On the afternoon of December 24, 1980, defendant and several others congregated in that downstairs apartment to open presents. Following this, defendant and Lorraine went to a Portland bar. Clyde and Tina Henessey, Michelle's nephew and niece, babysat for Michelle's children allowing her to go out with James Bellanceau, her ex-husband. These individuals then celebrated Christmas Eve by visiting various drinking establishments and the homes of friends.

Basil Moran returned to the upstairs apartment at approximately 10:00 p.m. and went to sleep in a back room. James and Michelle Bellanceau returned to the first floor apartment about the same time and went to sleep shortly thereafter. Clyde and Tina remained at Michelle's apartment that evening. Sometime later, Philip Gagnon, who occasionally stayed overnight at Lorraine's apartment, entered the upstairs apartment, presumably locked it, and then passed out on a bed in the front bedroom. Due to the weather conditions, Lorraine stayed at the home of a friend that evening.

At approximately 1:30 a.m. on December 25, 1980, defendant knocked on the door of the downstairs apartment and Clyde al-

  B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being ....

lowed him to enter. Michelle awoke and confronted the defendant. He asked her to pay his cab fare. Before receiving an answer, he ran into her bathroom and began showering. After initially balking, Michelle eventually paid the cab fare. Defendant remained in the bathroom approximately ten or fifteen minutes until Michelle threatened to call the police.

Defendant then left the downstairs apartment and climbed the only stairway leading to the second floor apartment. When he got to the apartment, he began banging on the door and yelling "open up, you f\_\_\_\_\_g bitch." Shortly thereafter, he returned downstairs and began dragging Christmas trees up the stairs. The trees had been outside and they were among the approximately eight remaining trees James Bellanceau had been unable to sell during the prior week.

Alerted by the commotion, Michelle checked to see what was happening and observed a large fire at the top of the stairway and a small one at the bottom. She saw defendant place a tree on the fire. He told her he was putting out the fire her mother started. He further stated that her mother was in the apartment; but, in the same breath, he also stated she was not upstairs. Michelle immediately returned to her apartment, roused the occupants, and phoned the fire department.

Basil Moran awoke to the smell of smoke and escaped onto the roof through a window in the rear bedroom. Philip Gagnon never awoke and he was discovered dead at the scene.

Sometime later, defendant was apprehended at the scene and transported to the Portland Public Safety Building. At approximately 5:45 a.m. that same day, defendant was properly interrogated. At trial, Detective Ross testified that the defendant admitted setting the fire. Detective Ross further testified that defendant made the following comments:

"[He] did it because he was mad at her."

"He thought she was at the house alone."

"[H]e went upstairs and they wouldn't let him in."

He started the fire because "he was mad at them and the kids were living in shame."

Also at trial, Dr. Billinsky, a licensed psychiatrist, testified that defendant told him he thought there was at least one person in the apartment who could escape out the back window. From this testimony the jury could conclude that defendant set the fire believing at least one person was in the apartment because he "was mad at her" (presumably Lorraine Flaherty) or "them" (unexplained).

In a two-count indictment, defendant was charged with the murder of Philip Gagnon and arson.[2] The jury found him guilty as charged. Defendant then appealed to this Court.

## II.

■ Defendant first challenges the trial justice's instruction regarding the nature of the death producing conduct required to convict the accused of "depraved indifference" murder. The trial justice instructed the jury on this point as follows:

First, the death producing conduct must be conduct which by its nature creates a very high degree of risk of serious bodily injury or death. The very high degree of risk is something more than a reasonable risk or even a high degree of risk. It is, however, something less than certainty or practical certainty.

Defendant claims the trial justice erred by instructing that defendant could be convicted of "depraved indifference" murder for conduct creating a very high but less than certain degree of risk of death or bodily injury. Since defendant never objected to the instruction given at trial, review is limited to whether there was manifest error depriving defendant of a fair trial. *State v. Pierce,* 438 A.2d 247, 252 (Me.1981).

Although defendant acknowledges that the jury instructions here were similar to

---

**2.** The indictment initially named Stephen Joy, Jr. as the defendant. At the arraignment, the trial court granted the State's motion to delete "Jr." from the indictment.

those recently upheld in *State v. Crocker,* Me., 435 A.2d 58, 67 (1981),[3] he contends the *Crocker* instructions were inconsistent with prior Maine law and this Court should now rethink its reasons for that change. We think defendant clearly misconceives the development of Maine law of "depraved indifference" murder. Recently, in both *State v. Woodbury,* 403 A.2d 1166, 1171–73 (Me.1979) and *State v. Crocker,* 435 A.2d at 64, this Court detailed the relevant history of "depraved indifference" murder. On both occasions, we concluded that section 201(1)(B) resurrected the objective standard governing the pre-Code offense of "implied malice" murder, and that pre-Code case law defined this standard as conduct manifesting a high tendency to cause death. We have consistently defined the "depraved indifference" standard similarly in cases under section 201(1)(B). *State v. Crocker,* 435 A.2d at 64; *State v. Lagasse,* 410 A.2d 537, 540 (Me.1980). Therefore, defendant's assertion that *Crocker* marked a change lacks merit. If anything, the slight change in phrasing from "high tendency to cause death" to "very high degree of risk of death" favors defendant.

This Court has previously stated that "[a] charge which strictly conformed to a current Law Court opinion squarely on point could hardly be called manifest error." *State v. Flick,* 425 A.2d 167, 173 (Me.1981). The instructions here essentially comported with the instructions upheld in *Crocker* except the trial justice here further explained that the "very high degree of risk" was "something less than certainty or practical certainty." Therefore, the narrow issue

presented is whether this explanation constituted manifest error.

Defendant argues that this explanation of the degree of risk posed by the death producing conduct is insufficient to convict an accused of murder. We disagree and find no error in the instruction. The trial justice properly instructed that the death producing conduct must create a very high degree of risk of death or serious bodily injury. His instructions as a whole clearly stressed that this very high degree of risk is quite substantial and something greater than a high degree of risk. The qualification that the degree of risk is something less than certainty or practical certainty did not detract from the requisite very high degree of risk. *See* W. LaFave & A. Scott, Jr., *Criminal Law* § 70 at 542 (1972). A jury certainly could find such death producing conduct "so heinous in the eyes of the law as to constitute murder." *State v. Woodbury,* 403 A.2d at 1173.

### III.

■ Defendant next asserts that the evidence was insufficient to convict him of murder.[4] Although he concededly set the fire causing the death of Philip Gagnon, he contends the evidence was insufficient to support a finding that: (a) he intentionally or knowingly caused the death of Philip Gagnon; or (b) his conduct manifested a depraved indifference to human life. We disagree. "When reviewing for sufficiency on appeal, the evidence is viewed most favorably to the prosecution, and is sufficient unless no trier of fact rationally could find proof of guilt beyond a reasonable doubt."

---

3. The *Crocker* instructions read as follows: "First, the death-producing conduct must be conduct which, by its very nature, creates a very high degree of risk of serious bodily injury or death ...."

4. Count I of the indictment charged defendant with two alternative forms of murder: (1) intentional or knowing murder under 17–A M.R. S.A. § 201(1)(A); and (2) "depraved indifference" murder under section 201(1)(B). The trial justice instructed the jury on both alternatives. The jury found defendant guilty as charged in Count I. Defendant did not object to the instructions nor did he challenge the

propriety of charging an accused with two alternative forms of murder in one count. The problem presented in the instant case is that the reviewing court cannot determine whether both alternatives or only one formed the basis of the jury verdict. *Cf. State v. Lagasse,* 410 A.2d at 540 (cautioned prosecutor to "carefully evaluate his evidence to determine whether in fairness to the defendant the charge of depraved indifference murder ought to be dismissed before trial commences"). Since we find the evidence is sufficient to support both alternatives, we do not reach this issue.

*State v. Flick,* 425 A.2d at 169. Our review of the record reveals sufficient evidence from which the jury could have found beyond a reasonable doubt that defendant was guilty of murder under both alternatives set forth in section 201(1)(A) and (B).

Based on the testimony of witnesses at the scene of the crime, the jury could have found that defendant set the fire in the middle of the night to the top and bottom of the only stairway exit leading from the second floor apartment. From the testimony of Detective Ross and Dr. Billinsky, the jury could have found that defendant set the fire believing at least one person was in the apartment. Defendant told Detective Ross that he thought Mrs. Flaherty was alone in her apartment and then told him that "they" would not let him enter it. During an interview with Dr. Billinsky, defendant stated that the apartment was occupied by a "bunch of weirdos" who could "jump out the back window." Finally, also on the basis of the testimony of Detective Ross and Dr. Billinsky regarding statements made by defendant, the jury could have found he set the fire because "he was mad at her" (presumably Lorraine Flaherty) or "them" (unexplained).

Although it is not clear whether the jury could have found that defendant knew Philip Gagnon was occupying the apartment when he set the fire, the jury clearly could have found that defendant set the fire intending to cause the death of the occupants of the apartment or knowing it would cause their death. Accordingly, we conclude that there is sufficient evidence from which the jury could have found defendant intentionally or knowingly caused the death of Philip Gagnon.[5]

Defendant, however, claims his statement to Dr. Billinsky that he thought the occupants could escape shows he did not intentionally or knowingly cause the death of Philip Gagnon. In light of all of the evidence, the jury certainly would have been warranted in discrediting this statement and concluding that defendant knowingly or intentionally murdered Philip Gagnon.

Furthermore, on the basis of the aforestated evidence, the jury could have concluded defendant's death producing conduct manifested a depraved indifference to the value of human life. Defendant argues his conduct did not create a very high degree of risk since one occupant did escape. We find this contention entirely lacking in merit. As set forth previously, there was sufficient evidence from which the jury could have concluded that defendant "consciously . . . engaged in conduct that he should have known would create a 'very high degree' of risk of death or serious bodily injury and '. . . under the circumstances . . . [it was] unjustifiable for him to take the risk'." *State v. Crocker,* 435 A.2d at 63, *quoting* W. LaFave & A. Scott, Jr., *supra* at 542. Accordingly, we find the evidence sufficient to sustain the murder conviction under section 201(1)(B).

### IV.

▪ At trial, a photo of Philip Gagnon's corpse was admitted into evidence over defense counsel's objection. The photo depicts the deceased sprawled across a bed in a fire damaged room. On appeal, defendant argues the trial justice erred in admitting this photo because it was irrelevant and unfairly prejudicial. "[P]hotographs are admissible if they are true and accurate depictions of what they purport to represent, if they are relevant to some issue involved in the litigation, and if their probative value is not outweighed by any tendency they may have toward unfair prejudice." *State v. Crocker,* 435 A.2d at 75. The issue of whether to admit the photograph is a matter for the sound discretion of the trial judge. *Id.* We, therefore, review whether the trial justice abused his discretion. *State v. Conner,* 434 A.2d 509, 513 (Me. 1981).

---

**5.** The trial justice properly instructed the jury that, in order to find defendant guilty of murder, they must find that "defendant's . . . conduct which caused Philip W. Gagnon's death was done intending to cause the death of a human being or was done knowing that the death of a human being would almost certainly result . . . ."

■ In making his discretionary judgment whether to admit the photo, the trial justice must balance the evidentiary value of the photograph against its potential to cause inflammatory prejudice. *State v. Conner*, 434 A.2d at 512. In the instant case, the photo had only slight evidentiary value to proving the State's case. The victim's identification was not in question. A pathologist had opined as to the cause of death prior to the prosecution's introduction of the photo into evidence. The photo does not shed light on the critical issues whether defendant's conduct created a very high degree of risk of death or serious bodily injury or whether he acted with the requisite state of mind. However, the photo was admitted early in the trial before the State could be sure the cause of death would be uncontested and it supported the State's contention that the victim did not die as a result of violence prior to the fire.[6] At best, the photo is cumulative evidence of the cause of death.

■ On the other hand, the photo is not gruesome. Although it depicts the deceased sprawled across a bed, neither the victim nor the bed show signs of burning. Furthermore, the victim's face is barely visible. We recognize that such a photo may potentially inflame jurors because it drives home the point that defendant's conduct killed a man. However, under the circumstances of this case, we conclude the trial justice did not abuse his discretion in admitting the photo. Although the photo had only minimal probative value, it was not gruesome and its potential for prejudicially inflaming jurors was slight.

### V.

■ Finally, defendant claims the trial justice erred by failing to instruct the jury that evidence of an abnormal mind may cast a reasonable doubt whether the State proved defendant's conduct was voluntary. Defendant neither requested such an instruction nor objected to the trial justice's instructions and, therefore, we review only for manifest error depriving defendant of a fair trial. *State v. Pierce*, 438 A.2d at 252.

17–A M.R.S.A. § 31(1) (Supp.1982) provides that "A person commits a crime only if he engages in voluntary conduct . . . ."[7] The Code does not define voluntary conduct. However, in *State v. Mishne*, 427 A.2d 450, 458 (Me.1981), we noted that the purpose of requiring voluntary conduct is "to prevent punishment of such involuntary physical actions which are not the product of the actor's conscious will." We also noted the Model Penal Code definition which "defines voluntary in terms of the meaning of involuntary actions: reflexes, convulsions, movements during unconsciousness or sleep, actions during hypnosis or resulting hypnotic suggestion." *State v. Mishne*, 427 A.2d at 458, *citing* Model Penal Code § 2.01(2).

Although the record contained evidence of an abnormal state of mind, a review of the trial transcripts failed to reveal an abnormal condition relevant to whether defendant's actions were voluntary. Thus, the evidence simply did not generate this issue. Accordingly, we find no error here.

The entry is:

Appeal denied.

Judgment affirmed.

All concurring.

---

**6.** We note that this case was tried before our decision in *State v. Conner*, 434 A.2d at 509. However, we made a point in that case which is relevant to this type of situation and worthy of reiteration. In *Conner*, 434 A.2d at 512 n. 2, we commented that "the [trial] court may exclude a photograph early in a trial, but allow it into evidence later if it becomes necessary." Although we conclude that the trial justice did not err in admitting the photo in this case, it would be preferable in the future for trial justices to exclude or withhold from the jury photos such as this when their evidentiary value is questionable and later subject it to reconsideration on the basis of a more fully developed record.

**7.** Section 31 was enacted in 1981. At the time defendant committed the crime, this text was found in section 51.